**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 12, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

QUIK PAYDAY, INC.,

      Plaintiff - Appellant,

v.

JUDI M. STORK, in her official capacity as Acting Bank Commissioner; KEVIN C. GLENDENING, in his official capacity as Deputy Commissioner of the Office Of The State Bank Commissioner, State Of Kansas,

      Defendants - Appellees.

_____

AMERICANS FOR TAX REFORM; ONLINE LENDERS ALLIANCE,

      Amici Curiae.

No. 07-3289

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 2:06-CV-02203-JWL)**

---

Daniel V. Folt, Duane Morris, LLP, Wilmington, Deleware (Matt Neiderman, Duane Morris, LLP, Robert J. Hoffman and Jeremiah J. Morgan, Bryan Cave LLP, Kansas City, Missouri, with him on the briefs), for Plaintiff - Appellant.

Adrian E. Serene, Staff Attorney (Jacob D. McElwee, Staff Attorney, on the brief), Office of the State Bank Commissioner, Topeka, Kansas, for Defendants - Appellees.

Richard P. Bress and Melissa B. Arbus, Counsel for Online Lenders Alliance, Latham & Watkins LLP, Washington, DC., and Cleta Mitchell, Counsel for Americans for Tax Reform, Foley & Lardner, LLP, Washington, DC, filed an amicus curiae brief for Online Lenders Alliance and Americans for Tax Reform.

---

Before **HARTZ**, **HOLLOWAY**, and **ANDERSON**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Quik Payday, Inc., which used the Internet in making short-term loans, appeals from the district court's rejection of its constitutional challenge to the application of Kansas's consumer-lending statute to those loans. Defendants were Judi M. Stork, Kansas's acting bank commissioner, and Kevin C. Glendening, deputy commissioner of the state's Office of the State Bank Commission (OSBC), both in their official capacities.

Quik Payday argues that applying the statute runs afoul of the dormant Commerce Clause by (1) regulating conduct that occurs wholly outside Kansas, (2) unduly burdening interstate commerce relative to the benefit it confers, and (3) imposing Kansas requirements when Internet commerce demands nationally uniform regulation. We disagree. The Kansas statute, as interpreted by the state officials charged with its enforcement, does not regulate extraterritorial conduct; this court's precedent informs us that the statute's burden on interstate commerce does not exceed the benefit that it confers; and Quik Payday's national-uniformity

argument, which is merely a species of a burden-to-benefit argument, is not persuasive in the context of the specific regulation of commercial activity at issue in this case. We have jurisdiction under 28 U.S.C. § 1291 and affirm the district court.

I.     BACKGROUND

From 1999 through early 2006, appellant Quik Payday was in the business of making modest, short-term personal loans, also called payday loans. It maintained an Internet website for its loan business. The prospective borrower typically found this website through an Internet search for payday loans or was steered there by third-party "lead generators," a term used for the intermediaries that solicit consumers to take out these loans. In some instances Quik Payday sent solicitations by e-mail directly to previous borrowers.

Once on Quik Payday's website, the prospective borrower completed an on-line application form, giving Quik Payday his or her home address, birthdate, employment information, state driver's license number, bank-account number, social security number, and references. If Quik Payday approved the application, it electronically sent the borrower a loan contract, which the borrower signed electronically and sent back to Quik Payday. (In a small number of cases these last few steps took place through facsimile, with approved borrowers physically signing the contracts before faxing them back to Quik Payday.) Quik Payday then transferred the amount of the loan to the borrower's bank account.

Quik Payday made loans of $100 to $500, in hundred-dollar increments. The loans carried $20 finance charges for each $100 borrowed. The borrower either paid back the loans by the maturity date—typically, the borrower's next payday—or extended them, incurring an additional finance charge of $20 for every $100 borrowed.

Quik Payday was headquartered in Logan, Utah. It was licensed by Utah's Department of Financial Institutions to make payday loans in Utah. It had no offices, employees, or other physical presence in Kansas.

Between May 2001 and January 2005, Quik Payday made 3,079 payday loans to 972 borrowers who provided Kansas addresses in their applications. Quik Payday loaned these borrowers approximately $967,550.00 in principal and charged some $485,165.00 in fees; it collected $1,325,282.20 in principal and fees. When a Kansas borrower defaulted, Quik Payday engaged in informal collection activities in Kansas but never filed suit.

Kansas regulates consumer lending, including payday lending, under its version of the Uniform Consumer Credit Code. *See* Kan. Stat. Ann. § 16a-1-101 through 16a-9-102 (KUCCC). The KUCCC defines payday loans, or "supervised loans," as those on which the annual percentage interest rate exceeds 12%. *Id.* § 16a-1-301(46). Under the KUCCC a payday lender (other than a supervised financial organization—in essence, a bank with a federal or state charter, *see id.* § 16a-1-301(44)) must obtain a license from the head of the consumer-and-

mortgage-lending division of the OSBC before it can make supervised loans in Kansas. *See id.* §§ 16a-1-301(2), 16a-2-302. Obtaining a license requires paying an application fee of $425 (and a further $325 to renew each year), posting a surety bond costing approximately $500 per year, and submitting to a criminal-background and credit check, for which there is no fee. Supervised lenders may not charge more than 36% per annum on unpaid loan balances of $860 or less, and may not charge more than 21% per annum on unpaid balances of more than $860. *See id.* § 16a-2-401(2). Supervised lenders are required to schedule installment payments in substantially equal amounts and at substantially regular intervals on loans of less than $1,000 and on which the finance charge exceeds 12%. *Id.* § 16a-2-308. When such loans are for $300 or less, they must be payable within 25 months, while such loans of more than $300 must be payable within 37 months. *Id.* § 16a-2-308(a)-(b). Quik Payday was never licensed to make supervised loans by the OSBC.

In 1999 Kansas amended the provision of the KUCCC that governs the statute's territorial application. *See id.* § 16a-1-201. Before that year a consumer-credit transaction was deemed to have been "made in th[e] state," and to come under the KUCCC, if either (a) the creditor received in Kansas a signed writing evidencing the consumer's obligation or offer, or (b) "the creditor induces the consumer who is a resident of this state to enter into the transaction by face-to-face solicitation in this state." 1993 Kan. Sess. Laws ch. 200 § 3. The

1999 legislation amended paragraph (1)(b) to say that the transaction is deemed to have been made in Kansas if "the creditor induces the consumer who is a resident of this state to enter into the transaction by solicitation in this state *by any means, including but not limited to: Mail, telephone, radio, television or any other electronic means*." Kan. Stat. Ann. § 16a-1-201(1)(b) (emphasis added). No party or amicus questions that the catch-all "other electronic means" includes the Internet.

Under the KUCCC a consumer's residence is the address given by the consumer as his or her address "in any writing signed by the consumer in connection with a credit transaction." *Id.* § 16a-1-201(6). The statute does not define "solicitation." Defendants conceded in district court, however, that merely maintaining a website accessible in Kansas that advertises payday loans is not solicitation in Kansas under § 16a-1-201(1)(b). *See Quik Payday, Inc. v. Stork*, 509 F. Supp. 2d 974, 982 n.7 (D. Kan. 2007).

In June 2005 the OSBC received a complaint from a Kansas consumer about a loan transaction with Quik Payday. The agency responded by ordering Quik Payday, which was not on its list of licensed supervised lenders, to produce documents regarding its loans to Kansas residents. Quik Payday submitted the requested documents, which revealed the above-mentioned 3,079 payday loans to 972 Kansas residents. On March 13, 2006, the OSBC issued a summary order that required Quik Payday to stop all payday lending to Kansas residents, halt any

collections on outstanding loans, pay a civil penalty of $5 million, and return to the borrowers the interest, service fees, and profits from the 3,079 loans. The order also barred Quik Payday from applying in the future to become a licensed payday lender in Kansas. Quik Payday timely requested an administrative hearing to challenge the order.

On May 19, 2006, shortly before the scheduled date of the administrative hearing, Quik Payday filed this lawsuit under 42 U.S.C. § 1983 against Defendants in the United States District Court for the District of Kansas. (Quik Payday requested and was granted a stay of the administrative hearing; as a result, no final order has been entered in that proceeding.) Quik Payday's complaint in district court sought a declaratory judgment that Kansas could not regulate Quik Payday's loans and an injunction barring such regulation. It claimed that both Kan. Stat. Ann. § 16a-1-201(1)(b) itself and Kansas's application of its consumer-credit laws to Quik Payday under this provision of the statute are unconstitutional under the Commerce Clause and Due Process Clause.

Quik Payday moved for summary judgment, offering three arguments under the dormant Commerce Clause: (1) the statute is an impermissible extraterritorial regulation; (2) the statute impermissibly burdens interstate commerce under the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970); and (3) the statute subjects Internet lending to inconsistent state regulations. On the same day, Defendants moved for summary judgment on Quik Payday's constitutional

claims, including its contentions under the Due Process Clause that Kansas lacked the power to regulate it and that Kan. Stat. Ann. § 16a-1-201 is unconstitutionally vague and overbroad. (Quik Payday did not seek summary judgment on these due-process claims). The parties stipulated to the facts to be considered by the district court in deciding their motions.

The district court denied Quik Payday's motion for summary judgment and granted Defendants' cross-motion. It rejected each of Quik Payday's three Commerce Clause challenges to the Kansas statute and its application to Quik Payday. It rejected the contention that Kansas was seeking to regulate conduct entirely outside its borders because the Kansas statute is triggered only if there is both solicitation in Kansas and a loan to one of its residents. *Quik Payday*, 509 F. Supp. 2d at 981. With regard to *Pike* balancing, the court cited our decision in *Aldens, Inc. v. Ryan*, 571 F.2d 1159 (10th Cir. 1978), for the proposition that "a state's regulation of the cost and terms on which its residents borrow money from an out-of-state creditor is not outweighed by the burdens on interstate commerce." *Quik Payday*, 509 F. Supp. 2d at 979. And as to national uniformity, the court determined that Quik Payday had not shown that "internet payday lending specifically represents the type of commerce that should only be subject to nationally-uniform standards," *id.* at 983; its regulated conduct was aimed specifically at Kansas and did not necessarily implicate other states or their

-8-

regulations. The court also entered summary judgment for Defendants on Quik Payday's due-process claims. *Id.* at 984–85.

Quik Payday appeals the district court's grant of summary judgment to the Defendants and the denial of summary judgment to itself.[1] It does not challenge the district court's due-process rulings but only those regarding the Commerce Clause.

## II. DISCUSSION

We review a district court's decision to grant summary judgment de novo, viewing all facts in the light most favorable to the party opposing summary judgment. *See Jacklovich v. Simmons*, 392 F.3d 420, 425 (10th Cir. 2004). We will affirm a grant of summary judgment if there is no genuine issue of material fact and the prevailing party is entitled to judgment under the law. *See id.* at 426; Fed. R. Civ. P. 56(c). Likewise, we conduct de novo review of legal issues, including challenges to the constitutionality of statutes. *See Hoffmann-Pugh v. Keenan*, 338 F.3d 1136, 1138 (10th Cir. 2003).

### A. The Dormant Commerce Clause

The Supreme Court "long has recognized that th[e] affirmative grant of authority to Congress [to regulate interstate commerce] also encompasses an

---

[1]Although the denial of a summary-judgment motion is ordinarily not an appealable order, it can be reviewed when "it is coupled with a grant of summary judgment to the opposing party." *Yaffee Cos. v. Great Am. Ins. Co.*, 499 F.3d 1182, 1184 (10th Cir. 2007) (internal quotation marks omitted).

implicit or 'dormant' limitation on the authority of the States to enact legislation

affecting interstate commerce." *Healy v. Beer Inst.*, 491 U.S. 324, 326 n.1

(1989); *see Dennis v. Higgins*, 498 U.S. 439, 447 (1991) ("[T]he Commerce

Clause does more than confer power on the Federal Government; it is also a

substantive restriction on permissible state regulation of interstate commerce."

(internal quotation marks omitted)).  State statutes may violate the dormant

limitation in three ways:

> First, a statute that clearly discriminates against interstate commerce
> in favor of intrastate commerce is virtually invalid *per se* and can
> survive only if the discrimination is demonstrably justified by a valid
> factor unrelated to economic protectionism.  Second, if the statute
> does not discriminate against interstate commerce, it will
> nevertheless be invalidated under the *Pike* [397 U.S. at 142]
> balancing test if it imposes a burden on interstate commerce
> incommensurate with the local benefits secured.  Third, a statute will
> be invalid *per se* if it has the practical effect of extraterritorial
> control of commerce occurring entirely outside the boundaries of the
> state in question.

*KT & G Corp. v. Att'y Gen. of Okla.*, 535 F.3d 1114, 1143 (10th Cir. 2008)

(internal quotation marks omitted).

Although Quik Payday treats the need for national uniformity as an

additional ground for determining that a state law violates the Commerce Clause,

concerns about national uniformity are simply part of the *Pike* burden/benefit

balancing analysis.  When assessing the burden of a state law on interstate

commerce, "the practical effect of the statute must be evaluated not only by

considering the consequences of the statute itself, but also by considering how the

challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Healy*, 491 U.S. at 336. For example, in *Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761 (1945), the Supreme Court declared that states may not "regulate those phases of the national commerce which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority." *Id.* at 767. But its holding that a state law could not limit train lengths was supported by what amounts to *Pike* balancing—namely, (1) a thorough analysis of the problems that would be created for interstate railroad transportation if each state could regulate train lengths and (2) an assessment that such state regulation would confer little, if any, local benefit. *Id.* at 771–79; *cf. ACLU v. Johnson*, 194 F.3d 1149, 1160 (10th Cir. 1999) ("[T]he Supreme Court has long recognized that certain types of commerce are uniquely suited to national, as opposed to state, regulation.").

Quik Payday does not argue that the Kansas statute discriminates against interstate commerce in favor of the local variety. Rather, it challenges the Kansas statute only under the extraterritorial-impact and *Pike*-balancing tests. To the extent that it also argues what it terms the "national unity" test, we will treat that issue as part of the balancing process.

B.     **Extraterritoriality**

Quik Payday argues that the Kansas statute regulates interstate commerce that happens entirely outside Kansas. It contends that the Kansas statute reaches cases in which a Kansas resident is "solicited" while using a work computer in Missouri and accepts the loan through the same computer. In support, it points to census data on the number of Kansas residents who work in metropolitan Kansas City, Missouri, and thus likely use computers that lie in Missouri. Additionally, it asserts that "lenders, having no ability to determine the physical location of the consumer at the time of the solicitation, are forced as a practical matter to abide by the K[U]CCC for all transactions with Kansas residents or refuse to lend to such residents altogether." Aplt. Br. at 43.

Defendants, however, have stipulated that such a transaction would not be governed by the Kansas statute. In district court they conceded that a website advertisement does not trigger application of Kan. Stat. Ann. § 16a-1-201(1)(b), even though the website is accessible in Kansas. *See Quik Payday*, 509 F. Supp. 2d at 982 n.7. Their brief in this court further clarified that the borrower's physical location at the time of the solicitation is controlling: it states that "[t]he [KUCCC] regulates the conduct of Internet payday lenders who choose to make payday loans with Kansas consumers *while they are in Kansas*." Aplee. Br. at 24 (emphasis added). And referring to Quik Payday's hypothetical "about a Kansas consumer leaving Kansas to acquire a payday loan," *id.* at 25, it declared that "the OSBC would not try to apply the [KUCCC] to loans that occur under th[ose]

-12-

circumstances," *id.* at 26. We adopt this reasonable interpretation of the statute by those charged with its enforcement. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982) ("In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered.").

Quik Payday argues, however, that in practice the KUCCC will set the rules by which a payday lender deals with a Kansas resident, even if the transaction is conducted wholly outside Kansas. According to Quik Payday, this result follows from its inability to tell where the resident is located during Internet communications between Quik Payday and the resident. For example, it says, if a Kansas resident communicates with Quik Payday via his office computer in Missouri, Quik Payday will have to assume that the customer is actually in Kansas during the communications and it therefore will have to comply with the KUCCC. In our view, however, Quik Payday has failed to show that this possible extraterritorial effect of the statute is more than speculation. It has provided no evidence of any loan transaction with a Kansas resident that was effected totally outside Kansas. Even if the Kansas resident applied for the loan on a computer in Missouri, other aspects of the transaction are very likely to be in Kansas—notably, the transfer of loan funds to the borrower would naturally be to a bank in Kansas. Although the Kansas statute would not apply to such a loan transaction (because the solicitation was not in Kansas), the transaction would not

be wholly extraterritorial, and thus not problematic under the dormant Commerce Clause. Moreover, Quik Payday has not explained how it would be burdensome to it simply to inquire of the customer in which state he is located while communicating with Quik Payday. In this circumstance, we will not hold that the KUCCC has a prohibited effect on extraterritorial commerce.

We note, however, that despite the failure of its constitutional challenge to the statute, Quik Payday may still be entitled to some relief. It is unclear whether any of the 3,079 transactions between Quik Payday and Kansas residents involved solicitations of Kansas residents while they were in Missouri or elsewhere outside Kansas. Such a transaction would not have violated Kansas law. That issue, however, is one for the state administrative proceeding that was stayed pending this litigation.

## C. *Pike* Balancing

A state law that does not discriminate against interstate commerce may still be invalidated under the dormant Commerce Clause if it puts a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. Although evidence regarding a particular company may be suggestive, the benefit-to-burden calculation is based on the overall benefits and burdens that the statutory provision may create, not on the benefits and burdens with respect to a particular company or transaction. "[T]he [Commerce] Clause protects the interstate market, not particular interstate firms,

from prohibitive or burdensome regulations." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127–28 (1978); *see Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 84 (1st Cir. 2002).

We applied *Pike* balancing in *Aldens*, which concerned Oklahoma's regulation of the interest rates charged to Oklahoma residents on interstate credit sales by an Illinois-based catalog retailer. The retailer had no physical presence in Oklahoma; all its advertising in the state was conducted by direct mail. 571 F. 2d at 1161. Its credit agreements with customers, which it also sent only by mail, recited that they were Illinois contracts and that all orders were deemed received in Illinois. *Id.* The retailer challenged the application of Oklahoma's statute setting maximum interest rates for credit transactions and prohibiting the collection of balances when the rates charged exceeded this cap. *Id.* at 1160. The parties stipulated that if Oklahoma law applied to the transactions with Oklahoma residents, Aldens' "reduction in finance charges, and the special processing costs directed to Oklahoma separately would amount to some $160,500.00 per year." *Id.* at 1161. Aldens' annual business in the state was $2,250,000, of which 81% was on credit. *See id.* We upheld Oklahoma's regulation against the retailer's Dormant Commerce Clause challenge, reasoning as follows:

> The states can, of course, pass Acts which affect commerce unless the burden so imposed greatly exceeds the extent of the local benefits.

> Thus is this burden an unreasonable one in interstate commerce?  [W]e reach the same conclusion [as other circuit courts].  There is a burden on Aldens to sort out the Oklahoma credit transactions, and accord them somewhat different treatment.  There are apparently regular mailings to some 34,000 Oklahoma residents; these are followed by additional flyers and, if required, credit applications and charge account agreements.  The dollar figure of total sales in Oklahoma is in the record as is an estimated cost of special treatment for Oklahoma residents.  We agree with the trial court that on balance, a conformance with the Oklahoma cost of credit rules would not constitute an undue burden on interstate commerce.  In the era of computers, the record shows that a sorting of this nature, with separate Oklahoma contracts, would not be such an unreasonable burden as compared to the local interest in the subject.

*Id.* at 1162 (citations omitted).

*Aldens* governs the analysis under the *Pike* test in this case.  To begin with, we note that our review of the KUCCC is limited.  Although Quik Payday might be burdened by statutory provisions regarding interest rates, repayment schedules, and loan renewals, we need not concern ourselves with provisions that have never been applied to Quik Payday (and which, because Quik Payday no longer operates as a payday lender, never will be).  Perhaps some of those unapplied provisions are unconstitutional and must be stricken.  But striking them would not entitle Quik Payday to relief if the provisions that *were* applied withstand a Commerce Clause challenge.  Here, the sanction imposed on Quik Payday was based solely on its failure to obtain a license as a lender of supervised loans.  Thus, we address only the burdens and benefits of the license requirement.  *Cf. Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 38 (1999) ("The traditional

-16-

rule is that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." (internal quotation marks omitted)).

The stipulated facts show that the burden of obtaining a license is limited to a $425 fee, a surety bond whose annual cost would be roughly $500, and a criminal-background check, for which there is no fee. Quik Payday presented no evidence of other expenses that it would incur. The burden on Quik Payday of obtaining a license would not be materially greater than the burden on Aldens. And on the other side of the ledger, Defendants point to significant benefits from the licensing requirement: the criminal-background check protects Kansas consumers from providing felons their financial data and access to their bank accounts; and the surety-bond requirement ensures that Kansas residents will have a meaningful remedy if they are harmed by a lender. We follow our decision in *Aldens* in holding that the burden of acquiring a license does not outweigh the benefit from that requirement.

Quik Payday tries to distinguish *Aldens* by suggesting that regulating Internet lending cannot, as a practical matter, protect Kansas residents, because such lenders can go offshore to avoid the reach of the state's law. In support, Quik Payday relies on our opinion in *Johnson*. That case involved constitutional challenges to a New Mexico statute that criminalized "dissemination of material

that is harmful to a minor by computer." 194 F.3d at 1152. The challenged

statute defined the offense as

> the use of a computer communications system that allows the input,
> output, examination or transfer of computer data or computer
> programs from one computer to another, to knowingly and
> intentionally initiate or engage in communication with a person under
> eighteen years of age when such communication in whole or in part
> depicts actual or simulated nudity, sexual intercourse or any other
> sexual conduct.

N.M. Stat. § 30-37-3.2(A) (1998). Our *Johnson* opinion affirmed the district

court's grant of a preliminary injunction against enforcement of the statute,

agreeing with the district court that the plaintiffs—groups whose Internet speech

concerned women's health, gay and lesbian issues, and censorship and civil

liberties, 194 F.3d at 1153—were likely to prevail on the merits of their claim

that the statute violated the dormant Commerce Clause. With regard to the

benefit the statute might confer relative to its burden on interstate commerce, we

observed that

> [t]he statute will almost certainly fail to accomplish the
> Government's interest in shielding children from pornography on the
> Internet. Nearly half of Internet communications originate outside
> the United States, and some percentage of that figure represents
> pornography. Pornography from, say, Amsterdam will be no less
> appealing to a child on the Internet than pornography from
> Albuquerque, *and residents of Amsterdam have little incentive to*
> *comply with the statute*.

.

*Id.* at 1162 (emphasis added; brackets and internal quotation marks omitted).

This conclusion was reinforced by the state's proffered construction of the statute

-18-

as governing only one-to-one e-mail communications between New Mexicans. This construction, we observed, "renders it so narrow in scope that the actual benefit conferred is extremely small." *Id.*

Our case is readily distinguishable from *Johnson* in this respect. An offshore lender may well have incentives to comply with Kansas law. *Johnson* did not involve credit transactions. One who sent pornography to New Mexico from Amsterdam needed nothing in the future from the New Mexico resident. Payday lending, however, would not be very profitable if the borrowers refused to repay, or were prevented from repaying, their loans. Regulators can educate borrowers regarding their rights not to repay loans, and they may have authority to control lenders by seizing assets (such as a bank account) from which a lender expects to be repaid. We are not persuaded that Kansas would be powerless to protect its residents from offshore payday lenders who refused to comply with applicable Kansas laws.

Quik Payday also relies on national-uniformity arguments to support its Commerce Clause challenge. It contends that the nature of the Internet requires any regulation of Internet operations to be national in scope, not state-by-state. It finds support in the following quotation from *County of Mobile v. Kimball*, 102 U.S. 691 (1880):

> Commerce with foreign countries and among the States, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and

property, as well as the purchase, sale, and exchange of commodities. For the regulation of commerce as thus defined there can be only one system of rules applicable alike to the whole country; and the authority which can act for the whole country can alone adopt such a system. Action upon it by separate States is not, therefore, permissible.

*Id.* at 702. Quik Payday also quotes our comment in *Johnson* that "[t]he Internet, like rail and highway traffic, requires a cohesive national scheme of regulation so that users are reasonably able to determine their obligations." *Johnson*, 194 F.3d at 1162 (ellipses and internal quotation marks omitted).

But Quik Payday reads too much into these statements. The courts have not held that certain modes of interstate commerce always require uniform regulation. They have examined particular types of regulation and made individual determinations. For example, the Supreme Court has not held that all regulation of interstate railroads must be national in scope. In *Southern Pacific* the Court held that the length of interstate trains could not be regulated state by state, *see* 325 U.S. at 781–82, but it did not retreat from its prior decisions allowing individual states to impose some safety measures, such as limitations on the size and composition of crews on interstate trains, *see id.* at 779, 782.

Similarly, our language in *Johnson* must be read in the context of that case. The New Mexico statute at issue prohibited the use of the Internet "to knowingly and intentionally initiate or engage in [sexually explicit] communication with a person under eighteen years of age." *Johnson*, 194 F.3d at 1152 (internal

quotation marks omitted). We rejected the state's attempt to construe this statute narrowly to include only Internet communications deliberately sent to a specific individual whom the sender knew to be a minor, *see id.* at 1158–59, and said that the prohibition extended to group communication, *see id.* at 1160. Our concern was that the statute would govern websites, bulletin-board services, and chat rooms, which can be accessed by virtually anyone, anywhere, without control by the one posting the information. *See id.* at 1157. If such a posting were subject to New Mexico law, it would be equally subject to the laws of every jurisdiction in which the Internet operated. *See id.* at 1159 ("[V]irtually *all* communication on the Internet would meet the statutory definition of 'knowingly' and potentially be subject to liability under [the statute].") Such a regulatory regime could obviously cripple that medium of communication.

Regulation of one-to-one commercial exchanges via the Internet, however, is quite a different matter. The potential for multiple jurisdictions to regulate the same transaction is much more limited. We reject the argument that the dormant Commerce Clause prohibits such regulation just because the parties use the Internet to communicate. *Cf. Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) (in addressing whether the Due Process Clause prohibited a state's assertion of jurisdiction over an Internet transaction, the court wrote: "Traditionally, when an entity intentionally reaches beyond its boundaries to conduct business with foreign residents, the exercise of specific jurisdiction

[by the foreign jurisdiction over that entity] is proper. Different results should not be reached simply because business is conducted over the Internet." (citation omitted)). Surely, for example, a state could prohibit the use of e-mail to convey an extortionate threat, just as it could prohibit such a threat by telephone. The possible burden on commerce arising from inconsistency among jurisdictions with an interest in a one-to-one commercial transaction conducted over the Internet must be assessed with respect to the specific type of regulation at issue.

Thus, we turn to Quik Payday's argument based on the specifics of the KUCCC. It contends that subjecting it to regulation by multiple states will in fact create inconsistency that would unduly burden interstate commerce. Quik Payday's briefs present a compilation of payday-loan laws in various states that, in its view, reveal how unmanageable its business would be if Kansas and other states could each enforce its own rules. Our review of those laws raises doubts about the merits of Quik Payday's argument. But we need not resolve the matter. Quik Payday is not being penalized by Kansas for the way it renews loans, or even for the interest rate it charges. Its misconduct was a simple failure to get a Kansas license. And requiring a license in each state does not impose an undue burden. The Supreme Court rejected an analogous argument in *American Trucking Associations, Inc. v. Michigan Public Service Commission*, 545 U.S. 429 (2005). In that case, interstate trucking firms challenged Michigan's flat fee on trucks engaged in intrastate hauling (i.e., point-to-point deliveries within

-22-

Michigan) under the dormant Commerce Clause. *See id.* at 431–32. The challengers' purely local activity apparently consisted of "topping off" interstate loads with loads for local delivery, thereby maximizing the profitable use of cargo space. *See id.* at 435. They argued that because interstate trucks engaged in less intrastate trade as a share of their business than did purely local haulers, the flat fee discriminated against the former in favor of the latter. *See id.* at 431–32. The Supreme Court rejected the challenge on several grounds, among them that every state could legitimately assess such a fee without putting interstate commerce at a disadvantage:

> We must concede that here, as [the challengers] argue, if all States did the same, an interstate truck would have to pay fees totaling several hundred dollars, or even several thousand dollars, were it to "top off" its business by carrying local loads in many (or even all) other States. *But it would have to do so only because it engages in local business in all those States.*

*Id.* at 438 (emphasis added). If some future Internet payday lender were to point to potential inconsistency among the states in some other component of the KUCCC—say the handling of renewals—then a court could address whether the Commerce Clause bars this type of regulation. For this case, however, we need not undertake that task.

III. **CONCLUSION**

We AFFIRM the judgment of the district court.