**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-1020
_____

TITLEMAX OF DELAWARE, INC., d/b/a TitleMax;
TITLEMAX OF OHIO, INC., d/b/a TitleMax; TITLEMAX
OF VIRGINIA, INC., d/b/a TitleMax; TMX FINANCE OF
VIRGINIA, INC.

v.

ROBIN L. WEISSMANN, in Her Official Capacity as
Secretary of the Pennsylvania Department of Banking and
Securities,
                                        Appellant
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 1:17-cv-01325)
Magistrate Judge:  Honorable Mary Pat Thynge
_____

Argued December 8, 2021
_____

Before:  SHWARTZ, PORTER, and FISHER, <u>Circuit Judges</u>.

(Filed: January 24, 2022)

Douglas D. Herrman
Troutman Pepper Hamilton Sanders LLP
Hercules Plaza, Suite 5100
1313 N. Market Street, P.O. Box 1709
Wilmington, DE 19899

Richard J. Zack [ARGUED]
Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103

Counsel for Plaintiffs-Appellees

Sean A. Kirkpatrick
Office of Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120

Claudia M. Tesero [ARGUED]
Office of Attorney General of Pennsylvania
1600 Arch Street
Suite 300
Philadelphia, PA 19103

Counsel for Defendant-Appellant
_____

OPINION OF THE COURT
_____

SHWARTZ, Circuit Judge.

In this case, we are required to determine whether applying Pennsylvania usury laws to an out-of-state lender violates the dormant Commerce Clause. We conclude that it does not.

I

A

TitleMax Delaware, TitleMax Virginia, TitleMax Ohio, and TMX Finance Virginia (collectively "TitleMax") provide motor vehicle loans. When any customer, including a Pennsylvanian, seeks a loan from TitleMax, "[t]he entire loan process—from the application to the disbursement of funds—takes place . . . at one of TitleMax's brick-and-mortar locations . . . . If a loan is approved and TitleMax is the lender, TitleMax and the borrower execute a loan agreement . . . and the borrower receives the loan proceeds," App. 19, in the form of "a check drawn on a bank outside of Pennsylvania," App. 96. The loan agreement sets forth an interest rate as high as 180% and terms to secure the loan.

Under the agreement, the borrower grants TitleMax a security interest in the vehicle. To perfect the lien, the borrower provides TitleMax with the vehicle identification number, license plate number, and title certificate number. TitleMax then records its lien on the motor vehicle with the appropriate state authority, such as the Pennsylvania Department of Transportation ("PennDOT").

3

In addition to perfecting the lien in the borrower's state, TitleMax conducts servicing activities there, such as collecting payments, sending "phone calls[] or text messages," and "repossess[ing vehicles]." App. 326, 337. Borrowers can make payments while physically present in their home state in a variety of ways, including mailing, calling TitleMax to use a debit card, or visiting a "local money transmitter . . . to have fees transmitted to a TitleMax location." App. 181, 339.

TitleMax does not dispute that, prior to 2017, it engaged in these activities with Pennsylvania residents and repossessed vehicles located in Pennsylvania when a Pennsylvania-resident borrower defaulted.

TitleMax does not have any offices, employees, agents, or brick-and-mortar stores in Pennsylvania and is not licensed as a lender in the Commonwealth. TitleMax claims that it has never used employees or agents to solicit Pennsylvania business, and it does not run television ads within Pennsylvania, but its advertisements may reach Pennsylvania residents.

B

Two statutes, the Consumer Discount Company Act ("CDCA"), 7 Pa. Stat. §§ 6201-6221, and the Loan Interest and Protection Law ("LIPL"), 41 Pa. Stat. §§ 101-605, address lending activity. For example, the CDCA provides that "no person shall . . . make[] loans or advance[] money on credit, in the amount or value of . . . []$25,000[] or less, and charge, collect, contract for or receive interest . . . which aggregate in excess of the interest that the lender would otherwise be permitted by law to charge." 7 Pa. Stat. § 6203(A). The LIPL

4

sets forth a maximum interest rate of 6% for most loans below $50,000. 41 Pa. Stat. § 201(a).

Pursuant to its authority to enforce these laws, Pennsylvania's Department of Banking and Securities (the "Department") issued a subpoena requesting documents regarding TitleMax's interactions with Pennsylvania residents. 7 Pa. Stat. § 6212, 41 Pa. Stat. § 506. The subpoena sought loan agreements between TitleMax and Pennsylvania consumers, information presented to Pennsylvania consumers through the mail or internet, solicitations or offerings circulated or aired in Pennsylvania, records of TitleMax employees who traveled to Pennsylvania, a list of vehicles repossessed in Pennsylvania, a record of complaints from Pennsylvania consumers, a record of invoices or bills sent to Pennsylvania consumers, and any electronic transfers of funds from Pennsylvania consumer bank accounts.[1]

TitleMax stopped making loans to Pennsylvania residents after receiving the subpoena and asserts that it has lost revenue as a result.

---

[1] TitleMax claims it does not have the "technological capability to identify all TitleMax entities that provided loans and/or credit services to borrowers who resided in Pennsylvania at the time their loan was originated or the arrangement of their loan was facilitated," and thus "does not know the identity of all TitleMax entities that provided loans to Pennsylvania residents." App. 207.

5

C

TitleMax filed this action in the United States District Court for the District of Delaware, seeking injunctive and declaratory relief for, among other things, violations of the Commerce Clause. Separately, the Department filed a petition to enforce the subpoena in the Pennsylvania Commonwealth Court (the "Petition Action").[2]

In this action, the parties conducted discovery and filed cross-motions for summary judgment based on Younger abstention and the dormant Commerce Clause. The District Court granted TitleMax's motion and denied the Department's. The Court held that Younger abstention did not apply but found that, because TitleMax's loans are "completely made and executed outside Pennsylvania and inside TitleMax [brick-and-mortar] locations in Delaware, Ohio, or Virginia," the Department's subpoena's effect is to apply Pennsylvania's usury laws extraterritorially in violation of the Commerce Clause. TitleMax of Del., Inc. v. Weissmann, 505 F. Supp. 3d 353, 357-60 (D. Del. 2020).

The Department appeals.

---

[2] TitleMax removed the Petition Action to the Middle District of Pennsylvania. Pa. Dep't of Banking and Sec. v. TitleMax of Del., Inc. et al., No. 1:17-cv-02112-JPW (M.D. Pa. Nov. 16, 2017), ECF No. 1. The District Court remanded the case for lack of subject matter jurisdiction. Id., ECF No. 49. The Petition Action remains pending.

II[3]

We agree with the District Court that <u>Younger</u> abstention does not bar us from hearing this case but hold that applying[4] the CDCA and LIPL to TitleMax's conduct does not violate the Commerce Clause.[5]

A

In general, federal courts are "obliged to decide cases within the scope of federal jurisdiction." <u>Sprint Commc'ns,</u>

---

[3] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction under 28 U.S.C. § 1291. We review a district court's order granting summary judgment de novo, <u>Mylan Inc. v. SmithKline Beecham Corp.</u>, 723 F.3d 413, 418 (3d Cir. 2013), and we view the facts and make all reasonable inferences in the non-movant's favor, <u>Hugh v. Butler Cnty. Fam. YMCA</u>, 418 F.3d 265, 267 (3d Cir. 2005). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

[4] The parties agree that TitleMax's challenge to an investigation into a violation of Pennsylvania law is ripe.

[5] In its single-count Amended Complaint, TitleMax listed both the Commerce Clause and the Due Process Clause as grounds to enjoin the Department's investigation, but TitleMax did not rely on the Due Process Clause in its motion

7

Inc. v. Jacobs, 571 U.S. 69, 72 (2013). In certain limited circumstances, however, "the prospect of undue interference with state proceedings counsels against federal relief." Id. Under the Younger abstention doctrine, federal courts must refrain from interfering with three types of state proceedings. One of these is civil enforcement proceedings. Id. at 78.

A "civil enforcement proceeding" warrants Younger abstention where the proceeding is "akin to a criminal prosecution" in "important respects." Id. at 79 (citation omitted). To determine if a civil enforcement proceeding is quasi-criminal in nature, we consider whether (1) the action "was commenced by the state in its sovereign capacity," (2) the action was "initiated to sanction the federal plaintiff for some wrongful act," (3) there are "other similarities to criminal actions, such as a preliminary investigation that culminated with the filing of formal charges," and (4) "the State could have alternatively sought to enforce a parallel criminal statute." ACRA Turf Club, LLC v. Zanzuccki, 748 F.3d 127, 138 (3d Cir. 2014); see also Sprint, 571 U.S. at 79 ("Investigations are commonly involved.").

The Petition Action is not a "civil enforcement proceeding[]." Sprint, 571 U.S. at 73; ACRA Turf Club, 748 F.3d at 138. Although the Petition Action was commenced by the Department, a state agency, it was filed to enforce a

for summary judgment and mentioned due process only in a footnote in its brief before us. Thus, TitleMax has not preserved its due process claim. See Resol. Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

subpoena, not to sanction TitleMax. See Pa. Dep't of Banking & Sec. v. TitleMax of Del., Inc., 1:17-cv-02112-JPW (M.D. Pa. Nov. 16, 2017), ECF No. 1-2 (Petition to Enforce an Investigative Subpoena and Enjoin Respondents), at 10 ("In the event that a person fails to comply with a subpoena for documents or testimony issued by the [D]epartment, the [D]epartment may request an order from the Commonwealth Court requiring the person to produce the requested information."), 13 (requesting relief of an "Order against [TitleMax] requiring them to provide the information or documents required by the investigative subpoena, to enjoin them from further refusing any future requests for information made by the department, and to require Respondents to pay costs associated with bringing this action and conducting this investigation"). While enforcement of the subpoena may require TitleMax to produce information, it is not "retributive in nature" or "imposed to punish . . . some wrongful act." ACRA Turf Club, 748 F.3d at 140 (citation and quotation marks omitted). Indeed, no activity has occurred in the Petition Action, and the threat of contempt of court for noncompliance with an order that the state court may enter in the future is insufficient to convert the Petition Action as it currently stands into a quasi-criminal case. See also Malhan v. Sec'y U.S. Dep't of State, 938 F.3d 453, 464 (3d Cir. 2019) (holding that an unfiled state proceeding cannot be part of an abstention analysis). Finally, while Pennsylvania has a parallel statute that make usury a crime, see, e.g., 18 Pa. Stat. § 4806.3 ("Whoever engages in criminal usury . . . is guilty of a felony"), the existence of that criminal statute does not outweigh the other facts that show that the Petition Action here is not quasi-criminal.

Another type of case in which Younger abstention may apply is one that furthers the state court's ability to perform its judicial function. Sprint, 571 U.S. at 78. The Department relies on Juidice v. Vail, 430 U.S. 327 (1977), to argue that the threat of contempt for noncompliance with the subpoena invokes a unique judicial function. In Juidice, the Supreme Court held that federal-court interference with a state's contempt process is "an offense to the State's interest . . . likely to be every bit as great as it would be were this a criminal proceeding." Id. at 336 (citing Huffman v. Pursue, Ltd., 420 U.S. 592, 604 (1975)). There, however, the defendant was held in contempt for failing to comply with a subpoena for a deposition. In contrast, the Petition Action presents only a possibility of contempt, akin to any other case where courts issue orders and a party's noncompliance can lead to contempt. The Commonwealth Court has neither issued orders enforcing the subpoena nor made contempt findings. Id. at 329-30. There is thus no judicial contempt process with which this federal case can interfere. See Malhan, 938 F.3d at 464-65 (noting that Juidice only required abstention because the state courts had issued contempt orders at the time the federal lawsuit was commenced and holding that, because a garnishment order against the plaintiff was vacated a year earlier, the purported judicial action was not "wait[ing] to be entered" as required for abstention).

Thus, Younger abstention does not bar us from reaching the merits of this case.[6]

---

[6] The third category of cases to which Younger may apply is state criminal prosecutions, Sprint, 571 U.S. at 78, but the Petition Action is not a criminal prosecution.

10

B

The Commerce Clause provides that "Congress shall have Power . . . To regulate Commerce . . . among the several States." U.S. Const., art. I, § 8, cl. 3. This affirmative grant of authority to Congress "also encompasses an implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce." Instructional Sys., Inc. v. Comput. Curriculum Corp., 35 F.3d 813, 823 (3d Cir. 1994) (citing Healy v. Beer Inst., 491 U.S. 324, 326 n.1 (1989)). When evaluating whether a state statute violates the Commerce Clause, we examine the statute's effect on interstate commerce. Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 579 (1986). For example,

> [w]hen a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute only has indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

Instructional Sys., 35 F.3d at 824 (quoting Brown-Forman, 476 U.S. at 579). One way a challenged statute can "directly regulate" interstate commerce is if the statute has "extraterritorial effects that adversely affect economic production (and hence interstate commerce) in other states." Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.,

11

462 F.3d 249, 261-62 (3d Cir. 2006). A state law that directly controls commerce wholly outside its borders violates the dormant Commerce Clause, regardless of whether the state legislature intended for the statute to do so. Healy, 491 U.S. at 336.[7] If the state statute does not have such extraterritorial reach or discriminate against out-of-staters, then it will be upheld unless the burden on interstate commerce is "clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). This examination is sometimes referred to as Pike balancing.

We thus follow a two-step approach in analyzing TitleMax's Commerce Clause claim here. Initially, we address the "territorial scope of the transaction that [Pennsylvania] has attempted to regulate"[8] and whether such transactions occur

---

[7] TitleMax argues that "[w]here the extraterritoriality doctrine has been invoked . . . discrimination does not matter and is not an element of the claim," and that therefore "the Pike balancing test and related principles are . . . not relevant." Appellees' Br. at 38 n.14. This argument misunderstands the necessary analysis. Extraterritorial effect does not automatically trigger special examination. Indeed, some extraterritorial effect must be tolerated because, by analogy, courts routinely decide choice-of-law questions for contracts that cover multiple states, and there is "nothing untoward about applying one state's law" to "activities outside [that] state." See Instructional Sys., 35 F.3d at 825 ("[I]t is inevitable that a state's laws, whether statutory or common law, will have extraterritorial effects.").

[8] By issuing the subpoena, the Department is thus asserting that its usury laws may apply to TitleMax's conduct.

"wholly outside" the state. A.S. Goldmen & Co., Inc. v. N.J. Bureau of Sec., 163 F.3d 780, 786 (3d Cir. 1999). If the transactions do not occur wholly outside of Pennsylvania, then "we determine whether the [regulation] is invalid under the [Pike] balancing test." Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff, 669 F.3d 359, 372 (3d Cir. 2012).

1

The CDCA regulates loans and collection activity. 7 Pa. Stat. § 6213(A). TitleMax's transactions with Pennsylvanians involve both loans and collection, and these activities do not occur "wholly outside" of Pennsylvania. TitleMax's transactions involve more than a simple conveyance of money[9] at a brick-and-mortar store in a location beyond Pennsylvania's border. Rather, the loan creates a creditor-debtor relationship

---

We therefore examine whether applying Pennsylvania's usury laws to TitleMax's conduct violates the Commerce Clause.

[9] Moreover, even if TitleMax's transactions were understood to be limited to the "origination" of the loan, our precedent makes clear that contracts between a Pennsylvanian and an out-of-stater do not occur "wholly outside" Pennsylvania. In A.S. Goldmen, we noted that conceptions of the territorial scope of contracts have evolved over time. Under the "traditional" approach, a contract is "made" in the state where the offer is accepted. 163 F.3d at 786-87. Under the "modern" approach, contracts formed between citizens in different states "implicate the regulatory interests of both states." Id. Here, TitleMax extended credit to Pennsylvanians and, under the modern view, it does not matter that the consumers would have been physically outside of Pennsylvania when the transaction was initiated.

13

that imposes obligations on both the borrower and lender until the debt is fully paid. For instance, Pennsylvanians with TitleMax loans made payments to TitleMax while physically present in the state. See Quik Payday, Inc. v. Stork, 549 F.3d 1302, 1308 (10th Cir. 2008) (holding that a loan transaction is not "wholly extraterritorial" and thus not problematic under the dormant Commerce Clause where the "transfer of loan funds to the borrower would naturally be to a bank in [the consumer's state]"). In addition, TitleMax's loan agreements grant TitleMax "a security interest in the Motor Vehicle," which in the case of a Pennsylvania borrower is a Pennsylvania-registered automobile. App. 567-68. TitleMax records these liens with PennDOT and may repossess the vehicle if the consumer defaults on his loan. Thus, by extending loans to Pennsylvanians, TitleMax takes an interest in property located and operated in Pennsylvania.

These aspects of loan servicing make TitleMax's conduct different from that in the Healy line of cases, which largely involved transactions in goods that ended at the point of sale. See, e.g., Healy, 491 U.S. at 327 (price of beer); Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 519-20 (1935) (price of milk for producers); see also Pharm. Rschs. & Mfrs. of Am. v. Walsh, 538 U.S. 644, 669 (2003) (noting the extraterritoriality rule in Healy is "not applicable" to cases where a statute does not tie prices of in-state products to out-of-state prices).[10] Unlike the sale of a good, a TitleMax loan

---

[10] For this reason, the authorities TitleMax relies upon are inapt. See Dean Foods Co. v. Brancel, 187 F.3d 609, 620 (7th Cir. 1999) (volume premiums on milk); Legato Vapors, LLC v. Cook, 847 F.3d 825 (7th Cir. 2017) (construction and maintenance of manufacturing facilities); Carolina Trucks &

14

has a longer lifespan: it involves later payments and permits a physical taking (repossession) from inside another state. Because TitleMax both receives payment from within Pennsylvania and maintains a security interest in vehicles located in Pennsylvania that it can act upon, its conduct is not "wholly outside" of Pennsylvania.[11]

---

Equip., Inc. v. Volvo Trucks of N. Am., Inc., 492 F.3d 484 (4th Cir. 2007) (sales by truck dealers); Ass'n for Accessible Med. v. Frosh, 887 F.3d 664 (4th Cir. 2018) (price of prescription drugs); Sam Francis Found. v. Christies, Inc., 784 F.3d 1320 (9th Cir. 2015) (terms and conditions of artwork sales).

[11] A lack of "physical presence" in a state is not dispositive under a Commerce Clause analysis. See South Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2095, 2099 (2018). In Wayfair, the Supreme Court rejected the "physical presence" rule from Quill Corp. v. North Dakota, 504 U.S. 298 (1992), which held that States could not require businesses without a physical presence in their state to collect its sales tax and that mere shipment of goods into a consumer's state was insufficient for "presence." 138 S. Ct. at 2099. The Wayfair Court held that the Quill rule was incorrect and unworkable because "[m]odern e-commerce" facilitates closer connections between consumers and businesses regardless of physical presence or proximity. Id. at 2095. The Court explained that "a company with a website accessible in South Dakota may be said to have a physical presence in the [customer's] State via the customers' computers." Id. Applying the same reasoning here, the fact that TitleMax operates no brick-and-mortar stores in Pennsylvania does not close TitleMax off from Pennsylvania consumers. On the contrary, TitleMax's advertisements, through its website and through third-parties, reach customers in Pennsylvania and TitleMax informs

15

For these reasons, applying the Pennsylvania statutes to TitleMax does not violate the extraterritoriality principle.

---

Pennsylvania callers that they need to "come into the store to further discuss anything as far as the loan products," not that they cannot do business with them, App. 174. Indeed, their business relationship continues after the Pennsylvanian leaves the store and returns to Pennsylvania.

As a result, Midwest Title Loans, Inc. v. Mills, 593 F.3d 660 (7th Cir. 2010), on which the District Court relied in finding TitleMax's conduct was "wholly outside" Pennsylvania, is unpersuasive. Midwest relied in part on the reasoning of Quill, see, e.g., 593 F.3d at 668 ("[Quill] is an example of extraterritorial regulation held to violate the [C]ommerce [C]lause even though the entity sought to be regulated received substantial benefits from the regulating state, just as Indiana's regulation of Illinois lenders furthers a local interest—the protection of gullible or necessitous borrowers"), which is no longer good law. Aside from the "physical presence" rule in Quill, Midwest's primary authority was Healy, see 593 F.3d at 666, which involved a price affirmation statute, not a statute regulating loans and continuing obligations to pay. Moreover, Midwest took a narrower view of the loan transaction than our Circuit has taken. Cf. Aldens, Inc. v. Packel, 524 F.2d 38, 45 (3d Cir. 1975) (holding that a Chicago mail-order business's credit transactions with Pennsylvanians were subject to Pennsylvania's Goods and Services Installment Act because the burden on interstate commerce from regulating interest rates—the "time-price differential"—does not depend on "the happenstance of respective locations of buyer and seller"). Thus, its analysis does not govern.

16

Having determined that TitleMax's conduct does not occur wholly outside of Pennsylvania, we must determine "whether the burdens [from the state law being applied] on interstate commerce substantially outweigh[] the putative local benefits." Cloverland-Green, 462 F.3d at 258; see also Pike, 397 U.S. at 142 (holding that where a statute addresses "a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits"). The only burdens to be considered in the balancing test are those that "discriminate against interstate commerce."[12] Old Bridge Chems., Inc. v. N.J. Dep't of Env't Prot., 965 F.2d 1287, 1295 (3d Cir. 1992).

On the interstate commerce burdens side, application of Pennsylvania's usury laws to transactions with Pennsylvanians puts TitleMax in no different position than an in-state lender. See Instructional Sys., 35 F.3d at 826-27 ("[W]here the burden on out-of-state interests rises no higher than that placed on competing in-state interests, it is a burden on commerce rather than a burden on interstate commerce." (emphasis in original)). While it may be true that TitleMax could be subject to different interest rate caps depending on the borrower's state of residence, this result is not a "clearly excessive" burden on

---

[12] "If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." Pike, 397 U.S. at 142.

interstate commerce. First, a burden on a lender is not a burden on interstate commerce. Exxon Corp. v. Gov. of Md., 437 U.S. 117, 127-28 (1978) ("The [Commerce] Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations."). Second, a lack of uniformity in state interest rates is not an undue burden, as "Congress has deferred to the states on the matter of maximum interest rates in consumer credit transactions." Aldens, Inc. v. Packel, 524 F.2d 38, 45, 48-49 (3d Cir. 1975) (holding that application of Pennsylvania's installment contracts law to a mail-order creditor's business with Pennsylvania residents did not violate the Commerce Clause). Once it is clear that the laws do not discriminate between in-staters and out-of-staters, "the inquiry as to the burden on interstate commerce should end" and further analysis of the local benefits is unnecessary. Instructional Sys., 35 F.3d at 827.

Even if we consider the local benefits, we would conclude that they weigh in favor of applying Pennsylvania laws to TitleMax. The laws protect Pennsylvania consumers from usurious lending rates. TitleMax's interest rates may be as high as 180% but if the CDCA and LIPL applied, TitleMax's rates for Pennsylvania customers would be capped at 6%.[13] Cash Am. Net of Nev., LLC v. Pa. Dep't of Banking, 8 A.3d 282, 285-86 (Pa. 2010). "Pennsylvania's interest in the rates which its residents pay for the use of money for purchase of goods delivered into Pennsylvania is substantial enough to satisfy any due process objection to its attempt at regulating [credit on installment contracts]." Aldens, 524 F.2d at 43. The

---

[13] Not all car loans in Pennsylvania are capped at 6%. See 12 Pa. Stat. § 6243(e)(2) (capping interest rates at 21% for older, used motor vehicles).

18

local interest in prohibiting usurious lending is equally important when evaluating a Commerce Clause challenge. See, e.g., Aldens, Inc. v. LaFollette, 552 F.2d 745, 751, 753 (7th Cir. 1977) (holding that "[p]rotecting . . . citizens from usurious credit terms imposed when they are residents of the state" is a local interest sufficient for due process and for interstate-commerce balancing); Cash Am., 8 A.3d at 292 ("It is well established that public policy in this Commonwealth prohibits usurious lending, and this prohibition has been recognized for over 100 years."). Thus, any burden does not clearly exceed the local benefits. Pike, 397 U.S. at 142.

Pennsylvania has a strong interest in prohibiting usury. Applying Pennsylvania's usury laws to TitleMax's loans furthers that interest, and any burden on interstate commerce from doing so is, at most, incidental. Pennsylvania may therefore investigate and apply its usury laws to TitleMax without violating the Commerce Clause.

## III

For the foregoing reasons, we will reverse the judgment in favor of TitleMax and direct that the District Court enter judgment in favor of the Department.