In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2083

MIDWEST TITLE LOANS, INC.,

*Plaintiff-Appellee*,

*v.*

DAVID H. MILLS, Director of the Indiana
   Department of Financial Institutions,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:07-cv-1479-SEB-DML—**Sarah Evans Barker**, *Judge*.

ARGUED NOVEMBER 10, 2009—DECIDED JANUARY 28, 2010

Before POSNER and FLAUM, *Circuit Judges*, and DER-
YEGHIAYAN, *District Judge*.[*]

POSNER, *Circuit Judge*. An Illinois loan company,
Midwest Title Loans, Inc., sued under 42 U.S.C. § 1983 to

---

[*] Hon. Samuel Der-Yeghiayan of the Northern District of
Illinois, sitting by designation.

enjoin, as a violation of the commerce clause, the application to Midwest of Indiana's version of the Uniform Consumer Credit Code (a model code, provisions of which have been adopted in several states). Ind. Code §§ 24-4.5-1-101 *et seq*. The district court entered a permanent injunction, and the state appeals.

A provision added to the Indiana version of the model code in 2007 and aptly termed the "territorial application" provision states that a loan is deemed to occur in Indiana if a resident of the state "enters into a consumer sale, lease or loan transaction with a creditor . . . in another state and the creditor . . . has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means." § 24-4.5-1-201(1)(d). If the territorial-application provision is triggered, the lender becomes subject to the code and must therefore get a license from the state to make consumer loans and is bound by a variety of restrictions that include a ceiling on the annual interest rate that a lender may charge. The ceiling is the lower of 21 percent of the entire unpaid balance, or 36 percent on the first $300 of unpaid principal, 21 percent on the next $700, and 15 percent on the remainder. § 24-4.5-3-508. (There is an exception, inapplicable to this case, for payday loans. § 24-4.5-7-101 *et seq*.) A lender required to have a license who fails to obtain it or violates any of the statutory restrictions exposes himself to a variety of administrative and civil remedies. §§ 24-4.5-6-108, 24-4.5-6-110, 24-4.5-6-113. The failure to obtain a license also voids the loan—the borrower doesn't have to repay

even the principal. And a borrower who has paid finance charges in excess of those permitted by the code is entitled to a refund. § 24-4.5-5-202.

Midwest Title is what is known as a "[car] title lender." "Cash loans, variously called car title pawn, car title loans, title pledge loans, or motor vehicle equity lines of credit, are the latest, fast-growing form of high cost, high risk loans targeting cash strapped American consumers. Storefront and online lenders advance a few hundred to a few thousand dollars based on the titles to paid-for vehicles. Loans are usually for a fraction of the vehicle's value and must be repaid in a single payment at the end of the month. Loans are made without consideration of ability to repay, resulting in many loans being renewed month after month to avoid repossession. Like payday loans, title loans charge triple digit interest rates, threaten a valuable asset, and trap borrowers in a cycle of debt." Jean Ann Fox & Elizabeth Guy, "Driven into Debt: CFA Car Title Loan Store and Online Survey," p. 1 (Nov. 2005), www.consumerfed.org/pdfs/Car_Title_Loan_Report_111705.pdf (visited Dec. 4, 2009); see also Michael S. Barr, "Banking the Poor," 21 *Yale J. Reg.* 121, 164-66 (2004).

Until it received a letter in August 2007 from Indiana's Department of Financial Institutions advising it of the addition of the territorial-application provision to the code, Midwest had made title loans to Hoosiers (as Indianans like to call themselves) at annual percentage interest rates almost ten times higher than the maximum permitted by the code. They had a maturity of 12 to 24

months, were secured by the title to the borrower's motor vehicle, and were for no more than half the vehicle's estimated wholesale value. The loans were made only in person, at Midwest's offices in Illinois—it had no offices in Indiana. The loan would be in the form of a cashier's check payable to the borrower, drawn on an Illinois bank. The borrower was required to hand over a set of his car keys at the closing to enable Midwest to exercise self-help repossession of the car in the event of a default, so that it wouldn't have to go to court to enforce its lien should the borrower default. (In this respect, title lending is like pawnbroking—hence the alternative name "car title pawns.") A suit to enforce the lien would be infeasible because of the small size of the loans relative to the costs of litigation.

Midwest would notify the Indiana Bureau of Motor Vehicles of the loan as soon as it was made, so that it would be noted on the official record of the borrower's title, thus protecting Midwest's rights as a creditor from subsequent creditors to whom the debtor might grant a security interest in the vehicle. Repossessions occurred, naturally, in Indiana. Midwest would arrange with an Indiana firm to auction off the repossessed vehicle, and the auction would be held in Indiana.

Midwest advertised the loans on Indiana television stations and through direct mailings to Indiana residents. In 2006 it made more than two thousand such loans to Hoosiers, amounting to 9 percent of its loans that year. The two states adjoin and many Hoosiers live within a short drive, or even a walk, of Illinois. Ten of Midwest's

23 offices in Illinois are within approximately 30 miles of the Indiana border. Midwest discontinued its lending to residents of Indiana when it received the notice that the Indiana code applied to that lending.

The state asserts an interest in protecting its residents from what it describes as "predatory lending." There is a considerable body of thought that many consumers are incapable of making sensible decisions about credit. E.g., Oren Bar-Gill & Elizabeth Warren, "Making Credit Safer," 157 *U. Pa. L. Rev.* 1, 44-45 (2008); Paige Marta Skiba & Jeremy Tobacman, "Payday Loans, Uncertainty, and Discounting: Explaining Patterns of Borrowing, Repayment, and Default" (2008), http://bpp.wharton.upenn.edu/tobacman/papers/payday.pdf (visited Dec. 4, 2009); Ronald J. Mann & Jim Hawkins, "Just Until Payday," 54 *UCLA L. Rev.* 855, 881-82 (2007); Amanda Quester & Jean Ann Fox, "Car Title Lending: Driving Borrowers to Financial Ruin," pp. 6-7, Apr. 2005, www.consumerfed.org/pdfs/driving_borrowers_rpt.pdf (visited Jan. 13, 2010); Lynn Drysdale & Kathleen E. Keest, "The Two-Tiered Consumer Financial Services Marketplace: The Fringe Banking System and Its Challenges to Current Thinking About the Role of Usury Laws in Today's Society," 51 *S. Car. L. Rev.* 589, 605-10 (2000). According to this literature, many consumers can't make sense of the interest rates and other fees charged by loan companies, in part because of the complexity of most loan documents. They end up paying absurdly high rates when they could borrow at much lower rates from a bank or, without having to borrow at all, could draw upon savings that earn low interest. Many of the borrowers, lacking self-con-

trol—but unaware of this and therefore unable to take countermeasures—are incapable of moderating their desire for goods and services and end up overindebted.

The literature is mainly about payday loans but appears applicable to title loans as well. (See the articles by Fox & Guy and by Barr.) These and related forms of lending have been called "fringe banking," Ronald Paul Hill, "Stalking the Poverty Consumer: A Retrospective Examination of Modern Ethical Dilemmas," 37 *Journal of Business Ethics* 209, 214-15 (2002), but the pathologies identified in the literature may extend to more conventional forms of credit transactions. Bar-Gill & Warren, *supra*, 157 *U. Pa. L. Rev.* at 26-43; Oren Bar-Gill, "Seduction by Plastic," 98 *Nw. U. L. Rev.* 1373, 1375-76, 1395-1401 (2004). Congress is considering enacting a statute, proposed by the Treasury Department, that would create a federal Consumer Financial Protection Agency empowered to adopt regulations designed not only to prevent outright fraud in credit transactions but also to protect consumers of financial products from their cognitive limitations, limitations emphasized by behavioral economists. Consumer Financial Protection Agency Act of 2009, H.R. 3126, 111th Cong. (July 8, 2009); Adam J. Levitin, "The Consumer Financial Protection Agency," *Am. Bankr. Inst. J.*, Oct. 2009, pp. 10, 66-67; Joshua D. Wright & Todd J. Zywicki, "Three Problematic Truths About the Consumer Financial Protection Agency Act of 2009," *Lombard Street*, Sept. 14, 2009, pp. 29, 30-31; Editorial, "The State of Financial Reform," *New York Times*, Oct. 25, 2009, p. 7.

A contrary school of thought points out that people who cannot borrow from a bank because they have poor credit may need a loan desperately. If a ceiling is placed on interest rates, these unfortunates may be unable to borrow because the ceiling may be too low for the interest rate to compensate the lender for the risk of default. As a result, they may lose their house or car or other property or find themselves at the mercy of loan sharks. See Todd J. Zywicki, "Consumer Welfare and the Regulation of Title Pledge Lending," Mercatus Center Working Paper No. 09-36 (Sept. 2009), www.mercatus.org/sites/default/files/publication/WP0936_Consumer_Welfare_and_Regulation_of_Title_Pledge_Lending.pdf (visited Dec. 4, 2009); Jonathan Zinman, "Restricting Consumer Credit Access: Household Survey Evidence on Effects Around the Oregon Rate Cap," 34 *J. Banking & Finance* (forthcoming 2010); Donald P. Morgan & Michael R. Strain, "Payday Holiday: How Households Fare after Payday Credit Bans" (Federal Reserve Bank of New York Staff Reports No. 309, Feb. 2008), http://ftp.ny.frb.org/research/staff_reports/sr309.pdf (visited Dec. 4, 2009); Mann & Hawkins, *supra*, 54 *UCLA L. Rev.* at 884-94 (2007); Gregory Elliehausen, "Consumers' Use of High-Price Credit Products: Do They Know What They Are Doing?" (Networks Financial Institute Working Paper No. 2006-WP-02, May 2006), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=921909) (visited Dec. 4, 2009). An annual interest rate of 300 percent is astronomical. But a person who borrows $5,000 at that rate and repays it two weeks later pays only $577 in interest, and the loan may have enabled him to avert foreclosure on his house,

or some other dire event that would have cost him more than $577.

Against this benign view of "fringe banking" it has been argued that many of the borrowers end up rolling over their loans from month to month, which runs counter to the theory that these are short-term loans rationally incurred, despite their high cost, as a temporary response to unexpected setbacks. See Michael A. Stegman & Robert Faris, "Payday Lending: A Business Model That Encourages Chronic Borrowing," 17 *Economic Development Quarterly* 8, 19-21 (2003); Quester & Fox, *supra*, at 6-7; Drysdale & Keest, *supra*, 51 *S. Car. L. Rev.* at 605-10; and the passage quoted earlier from Fox & Guy.

We need not take sides in the controversy over the merits of "fringe banking." It is enough that Indiana has a colorable interest in protecting its residents from the type of loan that Midwest purveys.

Article I, § 8, cl. 8 of the Constitution, which provides so far as bears on this case that "Congress shall have Power . . . to regulate Commerce . . . among the several States," has been interpreted to bar states from establishing tariff walls or other harmful barriers to trade across state lines. E.g., *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192-94 (1994); *American Trucking Associations, Inc. v. Scheiner*, 483 U.S. 266, 280-87 (1987); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521-23 (1935) (Cardozo, J.). This interpretation is controversial, in part because it seems to do violence to the language of the clause. But it does not. The clause is ambiguous. If emphasis is placed on the first word—"*Congress* shall have Power"—

the clause implies that the states shall not have the power to regulate commerce. Because of the politics and workload of Congress, unless the courts recognized and enforced the exclusive federal power to regulate commerce the nation would be riddled with state tariffs; and a nation with internal tariff barriers is hardly a nation at all.

Tariffs seek to protect local producers from competition. Indiana, however, isn't trying to protect its title lenders from the competition of title lenders in other states. The territorial-application provision does not make Indiana law treat a title lender located in another state, such as Midwest, any worse than it treats Indiana lenders. All are subject to the same interest-rate ceilings and other strictures of the consumer credit code. But as the case law has long recognized, the commerce clause can be violated even when there is no outright discrimination in favor of local business. An earlier case of ours gave the example of "a severance tax on a raw material, such as oil or coal, of which the state (perhaps in conjunction with other states) has a monopoly or near monopoly and which is almost entirely exported rather than consumed locally. The incidence of the tax will fall on the consumers in other states, who have no voice in the politics of the producing state, and the result may be a level of taxation and resulting price to consumers that greatly exceeds the cost of the services that the state provides to producers of the raw material and that by doing so burdens the export of the raw material to other states." *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 555 (7th Cir. 2007). In such a case, where the regulation is

local but the consequences felt elsewhere, we explained that a plaintiff "has a steep hill to climb. 'Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is *clearly* excessive in relation to the putative local benefits.' *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) (emphasis added); see also *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471-74 (1981)." See also *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 579 (1986); *National Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1130-32 (7th Cir. 1995).

But another class of nondiscriminatory local regulations is invalidated without a balancing of local benefit against out-of-state burden, and that is where states actually attempt to regulate activities in other states. "The Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another." *Healy v. Beer Institute*, 491 U.S. 324, 337 (1989); see also *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, *supra*, 476 U.S. at 582-84; *Baldwin v. G.A.F. Seelig, Inc.*, *supra*, 294 U.S. at 521; *Dean Foods Co. v. Brancel*, 187 F.3d 609, 614-20 (7th Cir. 1999); *Morley-Murphy Co. v. Zenith Electronics Corp.*, 142 F.3d 373, 378-80 (7th Cir. 1998); *IMS Health Inc. v. Ayotte*, 550 F.3d 42, 62-64 (1st Cir. 2008); *Carolina Trucks & Equipment, Inc. v. Volvo Trucks of North America, Inc.*, 492 F.3d 484, 488-90 (4th Cir. 2007); *PSINet, Inc. v. Chapman*, 362 F.3d 227, 239-41 (4th Cir.

2004); *American Booksellers Foundation v. Dean*, 342 F.3d 96, 102-04 (2d Cir. 2003); *National Collegiate Athletic Ass'n v. Miller,* 10 F.3d 633, 638-40 (9th Cir. 1993); cf. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 570-73 (1996).

In *Healy*, Connecticut had passed a "price affirmation" law that required brewers to commit that the prices they charged for beer in Connecticut were no higher at the time of posting than the lowest prices charged in any state that bordered Connecticut. There was no discrimination in favor of Connecticut brewers, because there were no Connecticut brewers. Nevertheless the Supreme Court invalidated the law. A brewer might sell beer in New York and Connecticut and charge a higher price in Connecticut because the people of that state liked its beer more than New Yorkers did. Faced with the Connecticut price-affirmation law and viewing Connecticut as its more valuable market, the brewer might decide to raise its price in New York to the level of its price in Connecticut rather than reducing its Connecticut price. The state would thus be regulating prices in another state, albeit indirectly. Commerce would be impeded if states could regulate commercial activities in other states. The Court held that Connecticut's law violated the commerce clause.

The present case is both stronger and weaker for Midwest than *Healy* was for the Beer Institute. It is stronger because the effect of the territorial-application provision on an out-of-state business selling to customers in that state is more direct than in *Healy*; the provision forbids the making of title loans in Illinois to residents of Indiana on

the terms agreed to by the parties. It is weaker because there is no interference with transactions with residents of another state—but that cannot be a complete defense. Suppose Indiana decided that gambling had become a serious problem for its residents—many of them were becoming addicted and this was leading to bankruptcies that were playing havoc with family life and the Indiana economy. And so it decided to ban casinos in the state and to require casinos in all other states, if they wanted to do business with residents of Indiana, to obtain a license from Indiana that would forbid their allowing a Hoosier to bet more than $10 a day in a casino. A state law of that kind, however well intentioned and genuinely beneficial to the state imposing it, would burden interstate commerce by restricting travel and a firm's ability to deal with residents of a different state, even though the law treated out-of-state businesses no worse (in our example, even slightly better) than businesses located in the state. In *Quill Corp. v. North Dakota*, 504 U.S. 298, 314-18 (1992), the Supreme Court held that a state whose residents purchased by mail from sellers who had no office in the state could not require the seller to collect the use tax that the state imposed on sales to its residents. That is an example of extraterritorial regulation held to violate the commerce clause even though the entity sought to be regulated received substantial benefits from the regulating state, just as Indiana's regulation of Illinois lenders furthers a local interest—the protection of gullible or necessitous borrowers.

This case may seem less extreme than our hypothetical case of the gambling law. But that is only because the

parties have chosen to focus on the single out-of-state firm that happens to be the plaintiff, and the firm operates in a neighboring state, unlike a casino in Nevada. Illinois is not the only state that borders on Indiana, however. Title lenders in all four states contiguous to Illinois may decide not to seek an Indiana license but instead just to stop doing business with residents of Indiana, as Midwest has done even though they account for a significant part of the business of its Illinois offices.

Should we worry that Midwest may have distorted the ordinary mode of doing business in its industry in order to be able to invoke the constitutional prohibition of extraterritorial state regulation? Might not Midwest, were it not maneuvering to come under the umbrella of *Healy*, have opened offices in Indiana to serve its numerous Indiana customers? Had it done so, it would have come within the reach of the Indiana law without reference to the territorial-application provision.

But against this surmise is the fact that Midwest's practice of serving its Indiana customers exclusively from offices located in Illinois predated Indiana's attempt to apply its consumer credit code extra-territorially. Midwest prefers to deal with its customers face to face so that it can size them up, inspect the car, and check that the car keys that the customer gives it really are the keys for that car. Since so many Hoosiers live within a stone's throw of Chicago, Midwest felt no need to establish separate offices across the state line. There may also be aspects of Indiana law unrelated to its consumer credit code that deterred Midwest from opening any offices in the state.

There is no suggestion that Midwest located its offices in Illinois where it did in order to poach Hoosiers. It's not as if the offices are in parts of eastern Illinois in which the only consumer concentrations are in Indiana. Eight of Midwest's ten Illinois stores that are closest to the Indiana state line are in the Chicago metropolitan area. And it's not as if Midwest had been an Indiana firm operating only in Indiana, had relocated to Illinois, just across the border, when the territorial-application provision was enacted, and had continued to lend to residents of Indiana.

"Generally speaking," the Supreme Court said in *Healy*, "the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." 491 U.S. at 336-37; see also *Morley-Murphy Co. v. Zenith Electronics Corp., supra*, 142 F.3d at 378-80; *National Collegiate Athletic Ass'n v. Miller, supra*, 10 F.3d at 638-40. True, a couple of cases in other circuits suggest that the only relevant inconsistency is placing a firm under "inconsistent obligations*." Pharmaceutical Research & Manufacturers of America v. Concannon*, 249 F.3d 66, 82-83 (1st Cir. 2001); see also *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 826 (3d Cir. 1994). And that is not the situation here; Midwest can comply with Indiana's consumer credit code without (so far as appears) violating the law of Illinois or any other state. But we took a broader view of inconsistent state policies in the *Morley-Murphy* case and we must do so in this one. Suppose Illinois thinks title loans a good thing (and there is, as we pointed out earlier, some basis for that belief)—or at

least, as the absence of an Illinois counterpart to the Indiana law makes clear, thinks they shouldn't be restricted in the way that Indiana thinks they should be. To allow Indiana to apply its law against title loans when its residents transact in a different state that has a different law would be arbitrarily to exalt the public policy of one state over that of another.

Indiana points out that despite this arguable symmetry of state interests, its interest in regulating credit may be great enough to allow its courts to apply its credit law should Midwest sue a defaulting Indiana borrower in an Indiana court. Not that such suits are likely. The loans are too small to justify the expense of suits to collect them if there is a default; hence the importance to Midwest of self-help repossession. Midwest has yet to sue *any* of its title borrowers. But if there were a suit, an Indiana court might rule that Indiana had the "most intimate contacts" with the transaction and therefore that its law applied even though the loan had been made in Illinois. See, e.g., *OVRS Acquisition Corp. v. Community Health Services, Inc.*, 657 N.E.2d 117, 124 (Ind. App. 1995); *Dohm & Nelke v. Wilson Foods Corp.*, 531 N.E.2d 512, 513 (Ind. App. 1988); *Eby v. York-Division*, 455 N.E.2d 623, 626 (Ind. App. 1983). Or it might rule that Illinois's failure to limit the interest rates in title loans was so offensive to the public policy of Indiana that the Illinois law would not be enforced in Indiana—in which event the Indiana courts might refuse to apply Illinois law even if Midwest's contracts contained a choice of law clause directing that Illinois law govern a suit arising from the

contract—which they do. *Moll v. South Central Solar Systems, Inc.*, 419 N.E.2d 154, 162 (Ind. App. 1981); *Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 132-33 (7th Cir. 1990) (Indiana law). In short, "a particular set of facts giving rise to litigation [can] justify, constitutionally [that is, under the due process clause], the application of more than one jurisdiction's laws." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818-19 (1985); see also *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 307-13 (1981) (plurality opinion).

But if the presence of an interest that might support state jurisdiction without violating the due process clause of the Fourteenth Amendment dissolved the constitutional objection to extraterritorial regulation, there wouldn't be much left of *Healy* and its cognates. Connecticut had an interest in the price of beer to its residents, but that didn't save its statute from being held to violate the commerce clause. Wisconsin had an interest in preventing its dairy farmers from obtaining "unjustified" volume discounts from food processors in Illinois, yet we invalidated the prohibition in *Dean Foods Co. v. Brancel*, *supra*, even though, while the aim of the Wisconsin law was to protect small dairy farms from the competition of large ones, the law did not discriminate against out-of-state farmers or processors. See also *Carolina Trucks & Equipment, Inc. v. Volvo Trucks of North America, Inc.*, *supra*.

The concerns behind the due process and commerce clauses are different. *Quill Corp. v. North Dakota*, *supra*, 504 U.S. at 312-13. The former protects persons from

unreasonable burdens imposed by government, including extraterritorial regulation that is disproportionate to the governmental interest. The latter protects interstate commerce from being impeded by extraterritorial regulation. And imposing a state's law on transactions in another state has a greater extraterritorial effect (and greater effect on commerce) than the state's applying its own law to suits in its courts. The difference is especially pronounced in this case, since quite apart from Indiana's consumer credit code Midwest has no intention of suing defaulting debtors in Indiana or anywhere else. Maybe someday it will bring such a suit for the *in terrorem* effect; or maybe someday one of its debtors will sue it. But that potential for state judicial interference with Midwest's transactions is trivial in comparison to the interference created by the application of Indiana's law to every loan that Midwest might make to a resident of Indiana.

The interference was with a commercial activity that occurred in another state. Each title loan that Midwest made to a Hoosier was in the form of a check, drawn on an Illinois bank, that was handed to the borrower at Midwest's loan office and could be cashed there. Illinois was also where the conditional transfer of title to the collateral was made (the handing over of the keys—the "pawn"), and where the payments required by the loan agreement were received by Midwest. The contract was, in short, made and executed in Illinois, and that is enough to show that the territorial-application provision violates the commerce clause. Of course the loan proceeds were probably spent largely in Indiana, but the same would be true of the winnings of a Hoosier at a

Nevada casino. The consequences of a commercial transaction can be felt anywhere. But that does not permit New York City to forbid New Yorkers to eat in cities in other states that do not ban trans fats from their restaurants.

Our conclusion is not altered by the fact that Midwest advertises in Indiana. If Indiana cannot prevent Midwest from lending money to Hoosiers in Illinois, it cannot prevent Midwest from truthfully advising them of this opportunity. A state may not "take the commercial speech that is vital to interstate commerce and use it as a basis to allow the extraterritorial regulation that is destructive of such commerce." *Carolina Trucks & Equipment, Inc. v. Volvo Trucks of North America, Inc.*, *supra*, 492 F.3d at 491; cf. *Dean Foods Co. v. Brancel*, *supra*, 187 F.3d at 618-19.

Nor is the location of the collateral in Indiana a critical difference between this case and the other cases that have invalidated extraterritorial regulations. It just illustrates that a transaction made in one state can have repercussions in another. A firecracker bought by an Illinoisan in Indiana could cause an injury to the purchaser in Illinois. That would allow an Illinois court, in a suit by the injured purchaser against the Indiana seller, to apply its own law. But it would not allow Illinois to forbid Indiana to sell firecrackers to residents of Illinois in Indiana merely because Illinois forbids firms in Illinois to sell firecrackers and thus would not be discriminating against an out-of-state business. A contract can always go wrong and if it does the consequences will

often be felt in a different state from the one in which the contract was made and executed.

AFFIRMED.