REINHARDT, Circuit Judge,
concurring in part and dissenting in part.
In 1976, California passed the California Resale Royalty Act (the Act) — a law that, for the last 39 years, has secured invaluable benefits for talented artists. The Act requires that when a fine art sale takes place in California or the seller of the art (sometimes referred to in this opinion as the owner) resides in California, the seller or the seller’s agent must pay a five-percent royalty to the artist. Cal. Civ.Code § 986(a).[1] Under the Act, when a wealthy *1327 collector of modern art purchases for several million dollars a work of art that the prior owner bought for a minimal amount from a then-unknown young artist, the now-well-known artist will for the first time receive a measure of reasonable compensation for the art that he created.[2]
In the case before us, the defendants who challenge the statute are not the seller, the buyer, or even the artist, but two New York auction houses who under the Act are the sellers’ agents.[3] The Act imposes certain duties on them with respect to the disbursement of the royalty payments. The auction houses argue that because the Act imposes those duties in connection with art sales that take place outside of California, it violates the dormant Commerce Clause.[4] I agree that, for better or worse, the majority is compelled to conclude that, under the Supreme Court’s dormant Commerce Clause jurisprudence, the out-of-state regulation of out-of-state entities is unconstitutional and that, as a result, the auction-house defendants cannot be subjected to the obligations required of them in connection with sales that take place outside of California. That, however, has little to do with the fundamental purpose and operation of the Act, or with the majority’s unwarranted extension of the dormant Commerce Clause to declare a substantial portion of the Act unconstitutional — specifically, the portion that obligates Califormans to pay to the creators of the work of art a small part of the proceeds from the fine art that they sell at a profit regardless of where the actual sale takes place.
It is unfortunate that the majority goes far beyond deciding the constitutionality of the Act as applied to the out-of-state auction-house defendants. It decides a question entirely unnecessary to the resolution of this case when it holds the Act unconstitutional as applied to California art owners who ultimately receive proceeds from out-of-state sales and are then responsible for the payments to the artists. The majority does so despite the fact that no California art owners are a party to the case, and despite the fact that we could and should affirm -the district court’s grant of the auction-house defendants’ motion to dismiss on far narrower constitutional grounds. -
To make matters worse, the majority not only decides an unnecessary, highly disputable question regarding California art owners, but it decides it incorrectly. Indeed, I strongly disagree with the majority that Californians who sell their art by means of out-of-state transactions may not be required by California law to remit a portion of the proceeds they ultimately receive to the artists who created the works of art. If I found it necessary or even permissible to reach this issue, I would hold that the Act as applied to California art owners is not an extraterritorial *1328 regulation. In fact, the California statute represents only a minor regulation of the proceeds received from art sales by a small number of wealthy Californians.[5] It in no way regulates the actual extra-territorial sales. Indeed, it in no way affects such sales, but only imposes on Californians who dispose of their art for profit’ an obligation to remit a small part of the proceeds to a third party after the transaction has been completed.[6] Moreover, unlike in the Court’s extraterritorial regulation cases under the dormant Commerce Clause, the Act does not regulate the price or terms of sales in other states, nor require Californians whose art is sold out-of-state, or the buyers of such art, to seek regulatory approval in California before the institution or completion of such sales. For the above reasons, I dissent from the majority opinion to the extent that it holds the Act unconstitutional as applied to the actions of a California owner whose work of art is sold out-of-state.
As to the only question it is necessary for the court to answer — the application of the Act to out-of-state “agents” of California art sellers whose business is to sell art whether its owners are in-state or out-of-state residents — this case presents an entirely different legal question. That question is whether under the dormant Commerce Clause a California law may impose duties on out-of-state business entities that engage in out-of-state transactions. The defendant auction houses that sell the art work of Californians and the residents of numerous other states are New York entities engaged in the business of selling art primarily in New York. That the defendants are called agents of the owners of the art work is, for purposes of the dormant Commerce Clause, of no legal significance. The Supreme Court’s current case law requires us to hold unconstitutional the requirement by state laws that out-of-state entities take or refrain from taking actions outside of the regulating state. The California statute does just that. Therefore, although I have serious doubts that this aspect of the Supreme Court’s dormant Commerce Clause jurisprudence is wise, I reluctantly concur in the majority’s judgment that the Act is not constitutional as applied to the imposition of obligations on out-of-state agents (i.e., professional sellers of art, including the auction houses) of California art owners with respect to sales that are conducted outside of California.
I. California Art Owners
A. The Majority’s Unnecessary and Improper Decision
The Supreme Court has made clear that we are “bound by two rules ...: one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other, never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.” United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960) (citation and internal quotation *1329 marks omitted).[7] By deciding a constitutional question entirely unnecessary to the resolution of this case, the majority flagrantly violates both of these rules.
We have before us two lawsuits in which the defendants are out-of-state auction houses that acted as agents in New York for California art owners. They have moved to dismiss lawsuits filed against them as a result of their alleged noncompliance with the Act. We may affirm the district court’s grant of the defendants’ motions to dismiss by simply holding that the Act is unconstitutional as applied to the out-of-state agents. We need do no more, and under Raines, we therefore must do no more. By striking down not only the Act’s out-of-state applications to the two out-of-state agents, but also its applications to the in-state actions of California art owners who receive money from out-of-state sales, the majority opinion goes far beyond what is necessary to decide the case. Indeed, it decides a constitutional question regarding the application of the dormant Commerce Clause to California residents that is both highly disputable and wholly unprecedented. In doing so, the majority formulates a constitutional rule far broader than is necessary.to decide this case, in direct contravention of Raines.
The justification the majority puts forth for not narrowing its constitutional decision is plainly insufficient. The majority “deelinejs]” to narrow its decision “for the simple reason that the constitutional doctrine that we apply operates without regard to” the distinction between out-of-state agents and in-state sellers. Majority Op. at 1324. Here, the majority “simply” assumes the answer to the fundamental question in this case — whether the imposition of obligations on out-of-state agents conducting business outside of the regulating state is constitutionally indistinguishable from that state’s regulation of monetary proceeds received by its own residents. However one may ultimately resolve that question, it is at least clear that it is a highly controversial one on which we lack clear precedent. When such a question exists, but it is not necessary to decide it in the case before us, Raines is clear: we must not decide it.[8]
*1330 There is no other justification for the majority’s decision to disregard Supreme Court precedent and decide an unnecessary constitutional issue. That the defendants have asked us to decide a broader question that does not affect them is no excuse for such an unnecessary constitutional holding. Nor is the majority’s approach justified by the fact that the district court relied on broader reasoning than is necessary to grant the motions to dismiss. “We may affirm a district court’s judgment on any ground supported by the record, whether or not the decision of the district court relied on the same grounds or reasoning we adopt.” Atel Financial Corp. v. Quaker Coal Co., 321 F.3d 924, 926 (9th Cir.2003). The majority has simply decided an unnecessary constitutional question without any need or cause to do so, in blatant disregard of the Supreme Court’s instructions to the contrary.[9]
B. The Act Is Not Extraterritorial As Applied to Californians
Although the majority should not have reached the issue whether the Act is constitutional as applied to the conduct of California art owners, it compounded its error by deciding it incorrectly. The Su *1331 preme Court has explained that “the ‘Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside of the State’s borders, whether or not the commerce has effects within the state.’ ” Healy v. Beer Inst., 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (citation omitted). From this principle, the majority concludes that the Act must fall as to Californians who arrange for the sale of their art in New York or other states outside of California. Its rationale is that requiring Californians to give the artists a portion of the proceeds they receive from out-of-state sales of the art they created “facially regulates a commercial transaction that ‘takes place wholly outside of the State’s borders.’ ” Majority Op. at 1323 (quoting Healy, 491 U.S. at 336, 109 S.Ct. 2491). Contrary to the majority, were we permitted to resolve this question I would hold that the Act’s requirement that California art owners remit to the original artist a portion of the proceeds they receive from art sales is not in any respect a “regulat[ion of] a commercial transaction.” In my view, what the Act regulates is the use of the money that Californians ultimately receive from the transaction — not the transaction itself, and certainly not any out-of-state transaction.
Nowhere in its opinion does the majority explain how requiring Californians to remit a small percentage of the proceeds they ultimately receive from an out-of-state sale of art constitutes “regulat[ing] a commercial transaction,” let alone a “commercial transaction that ‘takes place wholly outside of the state’s borders.’ ” In fact, the Act in no way regulates the sale.[10] With respect to Californians whose art is sold out of state, the Act operates only after the transaction is completed, just as it does in the case of art sold in-state. In both cases, the Act deals solely with the income received by Californians — a clearly permissible subject of California’s regulatory authority. The Act tells Californians only that when they receive profits from a sale of fine art, they must comply with the obligations the law places on them. As applied to Californians, the Act is plainly a regulation of Californians’ in-state obligations — not a regulation of out-of-state entities, and not a regulation of out-of-state transactions. In sum, the Act is simply a regulation of the proceeds that Californians have received from the sale of art, regardless of where the sale takes place.
My conclusion is further supported by the Court’s cases that strike down laws as having an impermissible extraterritorial reach. In all such cases, the laws at issue have had a direct effect on out-of-state commercial transactions by regulating the price or terms of such transactions, see, e.g., Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935), or by otherwise requiring “an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another,” Healy, 491 U.S. at 337, 109 S.Ct. 2491 (citation omitted); Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986); Edgar v. MITE Corp., 457 U.S. 624, 641-43, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (plurality opinion). The Act, as applied to California art owners, is far different. It does not in any respect affect out-of-state actors or their transactions. Indeed, nothing in the Act dictates the price that a California art *1332 seller may charge when selling art outside of the state, and California does not impose any preconditions, whatsoever on sales by Californians who wish to dispose of their art out-of-state. The Court’s cases striking down state laws as extraterritorial regulations simply do not apply.
If we were permitted to reach this issue, I would uphold the Act as applied to Californians who sell their art in-state or out-of-state, in this country or elsewhere. I would hold that the Act’s requirement that Californians pay to the artists a portion of the proceeds they receive as a result of the sale of their art does not violate the dormant Commerce Clause.
II. Out-of-State Agents of California Art Owners
The constitutionality of the Act as applied to out-of-state agents of California art sellers presents a far different constitutional question. In an attempt to make the Act more effective, the legislature provided that whenever fine art is sold by an agent of a Californian — even if the agent is not a Californian, and even if the sale takes place outside of California — “the agent shall withhold 5 percent of the amount of the sale, locate the artist and pay the artist.” Cal. Civ.Code § 986(a)(1). The agents that the law contemplates are primarily major auction houses, such as defendants Christie’s and Sotheby’s, which, along with major auction houses in other countries, have the ability and experience to obtain the widest buyer pool and the highest prices for the sale of fine art. They also have the resources necessary to locate artists all over the world and to comply with the terms of the Act by remitting to them a portion of the proceeds. By relying on major auction houses to locate and pay artists, however, the Act imposes obligations on out-of-state entities with respect to transactions that occur outside of California. That obligation is a part of the transaction they conduct, and their role in that transaction is not completed until they have disbursed a portion of the funds they have received to the artist when he can be located. •
Unlike the obligations imposed by the Act on Californians after they receive monetary proceeds from the sale of their art regardless of where it is sold, it cannot be said that the Act’s imposition of special obligations on out-of-state agents for out-of-state transactions represents a regulation solely of the actions of the residents of the regulating state. Nor can it be said that as applied to out-of-state agents this case is a “practical effects” case- — i.e., a case concerning an intrastate regulation with possibly significant practical effects on out-of-state commerce. Majority Op. at 1324. Instead, as applied to the actions of out-of-state agents in conducting a sale of art outside of California, the Act directly applies “to commerce that takes place wholly outside of the State’s borders,” and is therefore per se invalid under the Court’s dormant Commerce Clause jurisprudence. Healy, 491 U.S. at 336, 109 S.Ct. 2491 (citation omitted); see also Valley Bank v. Plus System, Inc., 914 F.2d 1186, 1190 (9th Cir.1990).
I have serious doubts that such a per se rule is wise as a matter of policy or that it is within the purview of the dormant Commerce Clause as properly framed. The Supreme Court has explained that the' “crucial inquiry” under the dormant Commerce Clause is whether the law at issue is “a protectionist measure; or whether it can fairly be viewed as a law directed to legitimate local concerns.” City of Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); see also McBurney, 133 S.Ct. at 1719 (“Our dormant Commerce Clause jurisprudence ... is driven by a concern about ‘economic *1333 protectionism — that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.’ ” (citation omitted)). In its extraterritoriality cases, however, the Court neglects this central concern of the dormant Commerce Clause. Indeed, the Court’s requirement that we invalidate all state laws that apply extraterritorially “has nothing to do with favoritism. Even state laws that neither discriminate against out-of-state interests nor disproportionately burden interstate commerce may run afoul of extraterritoriality.... ” American Beverage Ass’n v. Snyder, 735 F.3d 362, 378 (6th Cir.2013) (Sutton, J., concurring).
This case is one such example. The Act imposes obligations on out-of-state entities not to serve any protectionist purpose, but rather to make the law’s valid requirement that Californians remit a portion of the proceeds they receive from art sales more effective. It does not provide any incentive for auction houses to sell the art of Californians relative to other states’ residents, nor does it impose more stringent regulations on out-of-state auction houses than it does on California auction houses. The Act, in short, is simply not the type of law to which the Court’s dormant Commerce Clause jurisprudence is primarily aimed; it in no way provides an advantage to California residents or discriminates against out-of-state businesses, and it serves a clearly legitimate local goal— strengthening an in-state regulation benefitting the arts.
Circuit courts in recent years have been compelled by the Court’s extraterritoriality doctrine to invalidate other state laws that serve no protectionist purpose whatsoever and that further clearly legitimate state goals, for the sole reason that they apply to out-of-state conduct directly. Michigan, for example, promoted recycling by requiring consumers for each beverage container purchased to pay a ten-cent deposit that is redeemable upon returning an empty container. Id. at 366 (majority opinion). In order to prevent the fraudulent redemption of ten cents for a container not purchased in Michigan, the state passed a law requiring that containers sold in Michigan bear a unique mark, and that the unique mark used on Michigan containers not be used on containers sold in other states. Id. at 367. Although the Sixth Circuit concluded that the law does not discriminate against interstate commerce in any manner, id. at 370-73, it held that the law’s unique-mark requirement was extraterritorial in violation of the dormant Commerce Clause because it regulated the marks on containers sold in other states, id. at 373-76. Like its Big Ten rival (though surely not its primary one) to the north, Indiana also had a laudable goal when it sought to protect its residents from predatory lending. It did so by subjecting all loan companies that advertise in Indiana and enter into a loan transaction with a resident of Indiana — irrespective of whether the loan company operates in Indiana — to Indiana lending regulations. Midwest Title Loans, Inc. v. Mills, 593 F.3d 660, 662-63 (7th Cir.2010). Despite the fact that this law, like the Michigan unique-mark law, did not discriminate against or disadvantage out-of-state companies, id. at 665, the Seventh Circuit— correctly under the Supreme Court’s cases — held that the law’s application to an Illinois loan company violated the dormant Commerce Clause, id. at 665-69.
It is unfortunate that Supreme Court jurisprudence compels our Court in this case, and has compelled our fellow circuit courts in others, to invalidate the extraterritorial application of such innocuous and beneficial state laws. I suspect that, in our increasingly interconnected country, we will continue to see efforts from states *1334 to further legitimate local goals even though, in some respects, they may directly affect conduct outside of their borders. Some efforts may well intrude on the autonomy of other states, and federal courts may be forced to intercede. I have serious doubts, however, that we should invalidate every state law that applies to out-of-state conduct. In short, I would hope that, given the numerous changes in commerce that have recently occurred, the Supreme Court would reconsider whether the per se rule it articulated in Healy remains a necessary aspect of our dormant Commerce Clause jurisprudence.
In the meantime, I regret that my colleagues in the majority have extended the extraterritoriality doctrine far beyond where it has ever previously been invoked by invalidating the California Resale Royalty Act not only as it applies to out-of-state agents who conduct out-of-state auctions or sales, but also as to its provisions that require Californians to pay a royalty to artists following a profitable fine art sale regardless of the site of the sale.

. The statute contains various exceptions. See Cal. Civ.Code § 986(b). It does not apply, for example, to resales after the death of the *1327 artist, id. § 986(b)(3), unless the artist died after January 1, 1983, in which case "the rights and duties created under [the Act] shall inure to his or her heirs, legatees, or personal representative, until the 20th anniversary of the death of the artist,” id. § 986(a)(7).

.Of course, the compensation the artist receives is by no means excessive. If a painting sells for $1 million, the artist does not become a millionaire; he receives $50,000, while the individual who was wise enough to purchase the painting originally retains $950,000.

. The third defendant, eBay, is not an "agent” within the meaning of the Act, and is therefore not subject to the Act. Cf. Cal. Att'y Gen. Op. No. 02-111 (2003) (“eBay does not act as an 'agent' for either the seller or buyer during the auction bidding process.” (citing Cal. Civ. Code § 2295)).

. The defendant auction houses in this case are Christie's, Inc., and Sotheby's, Inc.

. The majority takes exception to my characterization of the Act as constituting only a “minor regulation of the proceeds.” See Majority Op. at 1324 n.l. Although I disagree with the majority’s view that requiring wealthy art owners to remit a five-percent royalty payment from profitable art sales to the artists of the works sold is more than “minor,” that disagreement is entirely immaterial to the legal issue before us: whether the Act, as-applied to California art owners, regulates out-of-state transactions and thus violates the dormant Commerce Clause. ■

. The Act does not apply “[t]o the resale of the work of fine art for a gross sales price less than the purchase price paid by the seller.” Cal. Civ.Code § 986(b)(4).

. See also New York v. Ferber, 458 U.S. 747, 768, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) ("By focusing on the factual situation before us, and similar cases necessary for development of a constitutional rule, we face 'flesh- and-blood’ legal problems with data 'relevant and adequate to an informed judgment.’ ” (footnotes omitted)); Broadrick v. Oklahoma, 413 U.S. 601, 610-11, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) ("[Ujnder our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws. Constitutional judgments ... are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court....” (citations omitted)).
The above principles, of course, do not apply to the First Amendment overbreadth doctrine, under which the Supreme Court has "allowed persons to attack overly broad statutes even though the conduct of the person making the attack is clearly unprotected and could be proscribed by a law drawn with the requisite specificity.” Ferber, 458 U.S. at 769, 102 S.Ct. 3348.

. In contrast to the distinction between out-of-state agents and in-state sellers, the hypothetical distinctions offered by the majority— between New York agents and Pennsylvania agents, and between corporate agents and natural persons — obviously do not present highly controversial questions relevant to this case; indeed, they do not present any questions relevant to this case, and thus would provide no basis for narrowing the decision. The majority’s hypothetical distinctions, unlike the differences that lie at the heart of the constitutional question that divides us, are, for all purposes, as irrelevant as the brown-cow / spotted-cow distinction about which most first-year law students learn during their first week’s class attendance, even at the law school that the majority opinion’s author and I attended.

. The majority is incorrect that the limited approach that Raines requires would, if applied here, compel the invalidation of the entire Act. See Majority Op. at 1325-26 n.2. To the contrary, under California law, were we to hold the statute unconstitutional as applied to the defendants "the appropriate remedy ... is to disapprove, or disallow, only the unconstitutional application of [the Act], thereby preserving any residuary constitutional application with regard to the other provisions of the [Act].” People v. Kelly, 47 Cal.4th 1008, 103 Cal.Rptr.3d 733, 222 P.3d 186, 213 (2010). The Act’s severability clause expressly provides that "[i]f any ... application [of the Act] to any person or circumstance is held invalid for any reason, such invalidity shall not affect any other provisions or applications of [the Act] which can be effected, without the invalid ... application....” Cal. Civ.Code § 986(e) (emphasis added). "A severability clause, although not conclusive, 'normally calls for sustaining the valid part of the enactment. ... The final determination depends on whether “the remainder ... is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute.” ' ” Walnut Creek Manor v. Fair Emp’t & Hous. Comm’n, 54 Cal.3d 245, 284 Cal.Rptr. 718, 814 P.2d 704, 717 (1991) (citation omitted) (internal quotation marks omitted). These requirements are clearly met in this case, as all of the duties imposed by the Act on agents are imposed in the alternative on California art owners. Indeed, after holding the Act unconstitutional as applied to the defendants, all of the duties imposed by the Act in connection with out-of-state sales would be fully "effected,” as they would simply fall on California art owners alone, and all could be performed in California following the receipt of the proceeds by those owners. As to what the legislature would have done, even the majority acknowledges that it would have adopted the Act regardless of its partial invalidation.
The majority also protests that the application of the Raines requirement would fail the grammatical separability test. The grammatical separability requirement exists, however, only when we sever invalid portions of a statute, as the majority mistakenly does. See Cal. Redev. Assn. v. Matosantos, 53 Cal.4th 231, 135 Cal.Rptr.3d 683, 267 P.3d 580, 607 (2011) (applying that requirement when determining "whether the invalid portions of a statute can be severed” (emphasis added)). In contrast, the limited approach that is required here would not invalidate any portions of the Act, but would rather hold only that its application in particular circumstances is unconstitutional, as the court did in Kelly and Walnut Creek. No grammatical separability requirement applies in California when a court holds a statute unconstitutional as applied in particular circumstances, as .no words of the Act must be stricken in doing so. See Walnut Creek, 284 Cal.Rptr. 718, 814 P.2d at 716. Indeed, neither Kelly nor Walnut Creek applied the grammatical separability requirement, despite the fact that such requirement preceded those cases in California law. See Calfarm Ins. Co. v. Deukmejian, 48 Cal.3d 805, 258 Cal.Rptr. 161, 771 P.2d 1247, 1256 (1989).

. In this section, I assume that the obligations placed on out-of-state agents by the Act are stricken, and all of the proceeds from the sale are transmitted to the California seller. Under this assumption, it is the Californian and not the agent who has the obligation to remit a small royalty payment to the artist.