STATE OF MINNESOTA

IN SUPREME COURT

A13-1388

Court of Appeals                                                                                    Stras, J.

State of Minnesota by its

Attorney General, Lori Swanson,

                    Respondent,

vs.                                                                                    Filed:  October 7, 2015
                                                                                    Office of Appellate Courts
Integrity Advance, LLC,

                    Appellant.

_____

Lori Swanson, Attorney General, Nathan Brennaman, Deputy Attorney General, Saint Paul, Minnesota, for respondent.

Mark J. Briol and Scott A. Benson, Briol & Assocs., PLLC, Minneapolis, Minnesota; and Claudia Callaway, Katten Muchin Rosenman, LLP, Washington, D.C., for appellant.

_____

S Y L L A B U S

1.      Minnesota's payday-lending law, Minn. Stat. §§ 47.60, 47.601 (2014), is constitutional under Article I, Section 8 of the United States Constitution, because it does not regulate commerce occurring wholly outside of Minnesota.

2.      The commerce regulated by Minnesota's payday-lending law in this case, which involved a Delaware company lending money to residents of Minnesota and

making deposits and withdrawals through Minnesota banks, was not wholly extraterritorial.

Affirmed.

O P I N I O N

STRAS, Justice.

Appellant Integrity Advance, LLC ("Integrity"), a Delaware company, made short-term, high-interest payday loans to Minnesota residents over the Internet. The Minnesota Attorney General sued Integrity, alleging that it had violated Minnesota's payday-lending law in a variety of ways. Integrity argued in response that, because it signed and executed the loans in Delaware, the application of Minnesota law to its loans violated the extraterritoriality principle of Article I, Section 8, Clause 3 of the United States Constitution, which prohibits a state from regulating commerce that occurs "wholly outside the . . . [s]tate." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989). The district court granted summary judgment to the State, and the court of appeals affirmed. For the reasons that follow, we also affirm.

I.

Payday loans, most often used by low-income or financially strapped consumers who lack access to other forms of credit, are short-term, high-interest-rate loans. *See Smith v. Steinkamp*, 318 F.3d 775, 775-76 (7th Cir. 2003). The maturity date of these loans is typically less than one month and generally coincides with the date on which borrowers receive their next paycheck. *See id.* The benefit of payday loans is that they allow borrowers to pay their basic living expenses in advance of their next paycheck.

2

However, many borrowers rely on payday loans as their main source of long-term credit and do not pay them back by their maturity date, which can result in extra fees and charges. *See State ex rel. King v. B & B Inv. Grp., Inc.*, 329 P.3d 658, 663, 671 (N.M. 2014).

Minnesota allows payday loans, but regulates their terms and conditions. Minn. Stat. §§ 47.60, 47.601 (2014). Among other things, Minnesota's payday-lending law limits the interest rates and fees that payday lenders can charge, Minn. Stat. § 47.60, subd. 2(a); restricts the duration of payday loans to no greater than 30 days, *id.*, subd. 2(b); and requires payday lenders to be licensed by the Commissioner of Commerce, Minn. Stat. § 47.601, subd. 6(b)(1). The law also contains a provision addressing "jurisdiction," which provides that "a consumer short-term loan transaction is deemed to take place in the state of Minnesota if the borrower is a Minnesota resident and the borrower completes the transaction, either personally or electronically, while physically located in the state of Minnesota." *Id.*, subd. 5.

Integrity is a Delaware limited liability company that operates as an online payday lender. It has never applied for, nor received, a license from the Minnesota Commissioner of Commerce to operate as a Minnesota lender. Yet Integrity has made 1,269 payday loans to borrowers who indicated on their applications that they resided in Minnesota. In the process of extending those loans, Integrity called or sent e-mails to borrowers, employers, and banks within Minnesota. Integrity also deposited loan proceeds and withdrew interest and principal through electronic funds transfers, also known as Automated Clearing House ("ACH") transfers, with Minnesota banks.

3

Integrity concedes that its payday loans did not comply with several provisions of Minnesota's payday-lending law. For example, Integrity charged annual interest rates of up to 1,369% to Minnesota borrowers, a figure that far exceeded Minnesota's ceiling for fees and interest rates on payday loans. *See* Minn. Stat. § 47.60, subd. 2(a). Integrity also automatically "renewed" its loans, a practice that caused many of its loans to exceed the 30-day statutory time limit. *See id.*, subd. 2(c).

After receiving complaints about Integrity's loan practices, the Attorney General filed a lawsuit against Integrity in 2011. *See* Minn. Stat. § 47.601, subd. 7 (permitting the Attorney General to enforce the payday-lending statutes). Integrity counterclaimed by requesting a declaratory judgment that Minnesota's payday-lending law is unconstitutional under the Commerce Clause, *see* U.S. Const. art. I, § 8, cl. 3, and the Due Process Clause of the Fourteenth Amendment, *see* U.S. Const. amend. XIV, § 1. On cross-motions for summary judgment, the district court rejected Integrity's constitutional challenges, concluded that Integrity had violated Minnesota's payday-lending statutes "many thousands of times," and awarded $7 million in damages and statutory penalties to the State. The court of appeals affirmed. *State ex rel. Swanson v. Integrity Advance, LLC*, 846 N.W.2d 435 (Minn. App. 2014). We granted review to determine whether Minnesota's payday-lending statutes violate Article I, Section 8, Clause 3 of the United States Constitution.

## II.

Article I, Section 8, Clause 3 of the United States Constitution, more commonly known as the Commerce Clause, grants Congress the power "[t]o regulate Commerce . . .

4

among the several States." As a complement to the explicit grant of power to Congress, the Supreme Court has held that "[t]he negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) (citations omitted). This principle, referred to by the Court as the "dormant Commerce Clause," "is driven by a concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.' " *McBurney v. Young*, ___ U.S. ___, ___, 133 S. Ct. 1709, 1719 (2013) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273-74 (1988)).

## A.

When a party challenges the constitutionality of a state statute under the "dormant Commerce Clause," the first task is to determine "whether [the] challenged law discriminates against interstate commerce." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008). If it does, the law is invalid unless it "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id.* (quoting *Or. Waste Sys., Inc. v. Dep't. of Envtl. Quality of Or.*, 511 U.S. 93, 101 (1994)). But if the law "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

An additional, related limitation on state regulation of commerce is that states may not enact laws that have a wholly "extraterritorial effect"—that is, laws that control "commercial activity occurring wholly outside the boundary of the State." *Healy v. Beer Inst.*, 491 U.S. 324, 337, 338 (1989); *see also Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 575 (1986) (holding that the Commerce Clause prohibits state statutes that "regulate[] out-of-state transactions"). The focus under the extraterritoriality doctrine is whether "the practical effect of the regulation is to control conduct beyond the boundaries of the [s]tate." *Healy*, 491 U.S. at 336. To determine a statute's "practical effect," we must consider not only the effects of the challenged statute itself, but also how it "may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Id.*

In the two leading cases on the extraterritoriality doctrine, the Supreme Court struck down price-affirmation statutes, which required regulated entities—specifically, alcohol distributors and distillers—to certify that the prices they charged to in-state customers matched the prices they charged to customers in other states. *See Healy*, 491 U.S. at 335-40; *Brown-Forman*, 476 U.S. at 582-84. The constitutional problem with these laws, the Court concluded, was that they effectively "regulat[ed] the price to be paid for liquor" in other states, *Brown-Forman*, 476 U.S. at 583, due to their effect of importing pricing decisions from other markets "regardless of local competitive conditions," *Healy*, 491 U.S. at 339.

## B.

The question presented by this case is whether Minnesota's payday-lending law has an analogous, impermissible extraterritorial effect by regulating "commercial activity occurring wholly outside the boundar[ies] of" Minnesota. *Id.* at 337. This question, which requires us to determine the constitutionality of Minnesota statutes, is one of law that we review de novo. *See Rew v. Bergstrom*, 845 N.W.2d 764, 776 (Minn. 2014).

Ordinarily in addressing a dormant Commerce Clause challenge, we would first determine whether the challenged law discriminates against interstate commerce, *Davis*, 553 U.S. at 338, and if not, whether the law excessively burdens interstate commerce under the *Pike* balancing test. *Pike*, 397 U.S. at 142. In this case, however, Integrity does not argue that Minnesota's payday-lending law is discriminatory or that it excessively burdens interstate commerce. In fact, it arguably concedes both points when it states in its reply brief that "Minnesota *may* apply its state lending regulations to commerce that occurs within Minnesota."

Instead, the parties' arguments focus on the extraterritoriality doctrine. In Integrity's view, Minnesota's payday-lending statutes regulate wholly out-of-state commerce because the company consummates its loan transactions in Delaware, its principal place of business and the location where it signs every loan agreement. The State responds that the site of contract formation is only one factor among many in determining the "location" of commerce. The State's position is more consistent with how the extraterritoriality doctrine functions.

7

Integrity's argument about the site of contract formation focuses on *Healy*'s prohibition of state regulation of "commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy*, 491 U.S. at 336 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality opinion)). In determining the location of the "commerce" being regulated, Integrity argues we should limit our analysis to the place where *it* signs the contract, not to the location where Integrity directs its contacts or to where its borrowers receive their money. Integrity's view of what qualifies as "commerce" is unjustifiably narrow.

In addressing the scope of the Commerce Clause, the Supreme Court has made clear that commerce is "economic activity," *United States v. Morrison*, 529 U.S. 598, 610-13 (2000), which includes, for example, "the production, distribution, and consumption of commodities," *Gonzales v. Raich*, 545 U.S. 1, 25-26 (2005) (quoting Webster's Third New International Dictionary 720 (1966)). In this case, the "economic activity" regulated by Minnesota's payday-lending law involved more than just Integrity's signature; the law governed the entire transaction between Integrity and borrowers. The law regulated the payment of funds to and from Minnesota borrowers, which for most of these loan transactions included electronic transfers into and out of Minnesota banks, activities that certainly qualify as commerce. *See Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1308 (10th Cir. 2008) (noting, in upholding the constitutionality of Kansas's lending law, as applied to an out-of-state payday lender, that "the transfer of loan funds . . . would naturally be to a bank in Kansas"). It also regulated the

8

approximately 28,000 calls and emails between Integrity and prospective borrowers in Minnesota by prescribing the terms and conditions of the loans Integrity could offer.

Notably, Minnesota's payday-lending law also includes a jurisdictional provision that restricts its regulatory scope to only transactions involving Minnesota residents who "complete[] the transaction . . . while physically located in the state of Minnesota." Minn. Stat. § 47.601, subd. 5. The existence of this provision distinguishes Minnesota's payday-lending law from the Indiana statute invalidated in *Midwest Title Loans, Inc. v. Mills*, which involved a lender from Illinois that made loans to Indiana residents at its Illinois offices. 593 F.3d 660, 661-62 (7th Cir. 2010). The predatory-lending law in *Mills* placed a variety of restrictions on lenders that advertised in Indiana, and Midwest Title, a lender that advertised in Indiana, received a notice that its loans were subject to the Indiana law. *See id.* at 662-63. Midwest Title challenged the law, asserting that it was unconstitutional under the Commerce Clause. *See id.* at 662. The Seventh Circuit agreed with Midwest Title, but emphasized that the impermissible extraterritorial effect of the law was its interference with commercial activity that occurred exclusively in another state. *See id.* at 669 (noting that the loan agreement was signed in Illinois, the check was drawn on an Illinois bank, the check was given to a borrower at one of Midwest Title's Illinois offices "and could be cashed there," and the conditional transfer of collateral occurred in Illinois). In this case, by contrast, Minnesota's payday-lending law would not apply, under its jurisdictional provision, to any transaction the borrower completes, whether personally or electronically, while physically located in another state.

*See Quik Payday*, 549 F.3d at 1308 (noting that a Kansas statute applied only to loans involving borrowers who were physically present in Kansas).

The negligible "practical effect" of Minnesota's payday-lending law on the commerce in other states confirms that the law does not violate the extraterritoriality doctrine.[1] *Healy*, 491 U.S. at 336. Although some loans subject to Minnesota's payday-lending law may be "interstate" in the sense that they involve an entity from another state lending to a Minnesota resident, mere regulation of interstate commerce is not the type of extraterritoriality with which *Healy* and *Brown-Forman* were concerned. Rather, a state law violates the extraterritoriality doctrine when it controls commerce occurring entirely within another state. Here, the payday-lending law does not control the terms on which companies lend money in other states. *See Healy*, 491 U.S. at 337-39. Nor does it require out-of-state companies to seek regulatory approval from Minnesota before they lend to borrowers in other states. *See Brown-Forman*, 476 U.S. at 582; *see also Pharm. Research and Mfrs. of Am. v. Walsh* (*PhRMA*), 538 U.S. 644, 669-70 (2003) (holding that the extraterritoriality rule was "not applicable" to a Maine drug-rebate law because the law did not regulate the price of any out-of-state transactions or tie in-state prices to out-of-state prices).

---

[1] Integrity's facial challenge fails because it cannot show that all applications of the payday-lending law are unconstitutional. *See, e.g.*, *McCaughtry v. City of Red Wing*, 831 N.W.2d 518, 522 (Minn. 2013) (describing the standard for facial challenges). The statutes have no (or at most, de minimis) extraterritorial effects when applied to loans made by Minnesota lenders to Minnesota borrowers.

As *Brown-Forman* recognized, nothing prevents a state from seeking "lower prices for its consumers" through regulation. 476 U.S. at 580. However, when a state attempts to procure that lower price by tying the intrastate price of a good to the prices charged for that good in other states, it violates the extraterritoriality doctrine. *See Healy*, 491 U.S. at 337-38; *Brown-Forman*, 476 U.S. at 580-82. It is true that Minnesota's payday-lending law requires payday lenders to provide more favorable "prices" for Minnesota residents—which, in the context of a loan, includes lower interest rates and fees—than those offered to borrowers from other states. However, unlike the laws invalidated in *Healy* and *Brown-Forman*, Minnesota's payday-lending law does not tie the requisite terms and prices for loans to the business conducted by Integrity or other payday lenders in other states. *See, e.g.*, *PhRMA*, 538 U.S. at 669-70; *Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205, 221 (2nd Cir. 2004) ("While the out-of-state wholesale prices of cigarettes may be affected by the Contraband Statutes, . . . out-of-state actors such as appellants remain free to conduct commerce on their own terms, without either scrutiny or control by New York State."). Accordingly, Minnesota's payday-lending law does not "control conduct beyond the boundaries of the State," *Healy*, 491 U.S. at 336, in the way those laws did.

### III.

For the foregoing reasons, we affirm the decision of the court of appeals and hold that Minnesota's payday-lending law does not violate the Commerce Clause of the United States Constitution.

Affirmed.